## HORACE MORRIL, BY NEXT FRIEND, APPELLANT, v. FLORENCE MORRIL, RESPONDENT.

Argued February 8, 1928—Decided May 29, 1928.

For the appellant, *Edward Sachar* (*Winfield S. Angleman*, of counsel).

For the respondent, *McDermott, Enright & Carpenter*.

The opinion of the court was delivered by

MINTURN, J. Upon the following state of facts the plaintiff was nonsuited at the Union Circuit:

The plaintiff, Horace Morril, a boy of thirteen years, was a guest at the house of his aunt, the defendant, Florence Morril, in November, 1926. She told him to go in the back yard to play, and he went and played catch football with several other boys there. He had never played there before. He caught a forward pass about three or four feet from the garage, when a door of the garage was blown open by the wind, and a bent, defective latch hit him in the eye, resulting in the loss of the eye. Defendant knew about the defective latch, and her husband had tried just previously to fix it, but, instead, had made it worse, and he intended getting a new latch. The door was a little open when play began, and one of the boys closed it, but the defective latch did not hold it against the wind.

It becomes manifest from a recital of these facts that the sole inquiry presented is whether an issue of fact was thereby developed which required the submission of the case to the jury.

While the rule is fundamental, based upon the settled maxim of the common law *ad questionem facti non respondet judice,* it has also its corollary and necessary adjunct *ad questionem legis non respondet juratores,* evincing the well-defined respective jurisdictions of court and jury, it becomes obvious that where there is no dispute upon the facts and no factual issue for the jury to consider, the definitive line of demarcation has been reached where the power of the jury to determine conceded facts cannot be legally involved since there is nothing for them of an issuable character to consider. Obviously, in such a situation the duty of invoking the rule of law devolves not upon the jury but upon the court, and in that manner declaring the judgment which the law imposes. It has been upon this legal theory of our dual system of procedure that nonsuits have been immemorially asked at *nisi prius,* and that verdicts have been vindicated and judgments absolute ordered upon rule to show cause.

Thus in *Parks* v. *Ross*, 11 *How.* (*U. S.*) 362, it is declared "in some of the states it is the practice, after the evidence for the plaintiff is closed, for the defendant to pray the court to instruct the jury, that there is no evidence upon which they can find a verdict for the plaintiff. This is equivalent to a demurrer to the evidence, and such an instruction ought to be given whenever the evidence is not legally sufficient to serve as a foundation of a verdict for the plaintiff." Obviously, a juncture may be reached in any presentation of facts where the inquiry becomes not one of disputed fact for a jury to consider, but one of uncontradicted facts, upon which the legal inquiry must be predicated whether conceding everything advanced in behalf of the plaintiff's case a legal liability may be evolved as the basis for a judgment. And, manifestly, when such a juncture is reached, the question becomes one of law for the consideration and application of the court. *Quinn* v. *West Jersey, &c., Railroad Co.,* 78 *N. J. L.* 539.

To create a legal liability upon the part of a defendant there must be something more apparent in the case than mere physical damage; there must exist under the well-settled rule of tort liability legal damages resulting from what has been scientifically termed a legal injury. In other words, the two elements of tort feasance according to the civil and common law commentators must concur, *damnum et injuria*. It is upon the recognition of that fundamental rule that the uniform rule of English and American law has been predicated, that the mere occurrence of physical injury involves no presumption of a legal injury with its consequent legal liability. This basic conception of the law has also given rise to the rule of *damnum absque injuria* under which the physical damage is apparent, but the legal injury is not apparent. *Hummer* v. *Lehigh Valley Railroad,* 75 *N. J. L.* 703; *Kingsley* v. *Delaware, Lackawanna and Western Railroad Co.,* 81 *Id.* 536; *Fielders* v. *Railway Co.,* 68 *Id.* 343; *Johnson* v. *Railway Co.,* 83 *Id.* 647.

Thus observes Blackstone:

"'Though there may be damages sufficient, yet if the fact be true it is *damnum absque injuria,* there is no injury [legal]

the law gives no remedy." 3 *Com.* 125. So, Dr. Luddington, an eminent commentator upon English law, recognized by Kent and others, observes: "It is essential to an action in tort that the act complained of should under the circumstances be legally wrongful as regards the party complaining —that is, it must prejudicially affect him in some legal right. Merely that it will, however, directly do him harm, is not enough. Cases are of daily occurrence in which the lawful exercise of a right operates to the detriment of another without being actionable." Citing *Rogers* v. *Raymond,* 8 *Mo. Ind. App.* 103. In consonance with this basic theory of legal injury American commentators have similarly declared: "The law does not infer that merely because one man has suffered harm he must have compensation and some other must pay. The monstrous task of ensuring against all loss has not been undertaken. On the contrary, not only have large and important classes of losses been denied judicial recognition, but the very nature of many admitted rights necessitates that much harm should go uncompensated." 1 *Jaggard Torts* 89; citing *Tucker* v. *Drake,* 11 *Allen (Mass.)* 145; *O'Donnell* v. *Segar,* 25 *Mich.* 367; 1 *Cooley Torts* 82, and cases.

From this fundamental conception of a legal wrong or injury as the cause or basis of the legal damage has arisen the corollary or legal rule now substantially automatic in its application, that the existing legal wrong or injury which presents the basis of the suit must be predicated upon the violation, neglect or omission of some legal duty which was imposed upon the defendant, and which constituted the proximate cause of the damage. The cases sustaining that principle are uniform throughout the states and numerous in this jurisdiction. *Monroe* v. *Pennsylvania Railroad Co., ubi supra; Kingsley* v. *Delaware, Lackawanna and Western Railroad,* and cases *supra.*

In the latter case the court declared: "The mere happening of an accident without some proof of facts from which the violation of a duty due to the plaintiff by the defendant may be legitimately inferred as a rule will not constitute negligence." Hence, it becomes imperative before legal liability for conceded damages can be imposed upon a defendant, for

the court in the first instance to inquire and determine the character of duty which the law under the facts imposed upon the defendant as the basis of liability; for manifestly it cannot be conceded that the jury from their inner consciousness may evolve in every variety of tort feasance a legal duty as the standard of liability. The rule of legal duty or the standard of human conduct under any given circumstances must be declared by the court as a preliminary to the submission of the case to the jury, and if upon the conceded facts no rule of legal duty can be said to have been transgressed, legal liability cannot be said to supervene so as to warrant the submission of the case to the jury. *Meyer* v. *Benton, 74 N. J. L.* 533.

It becomes essential, therefore, to inquire *in limine* as to the rule of legal duty which this defendant under the uncontested facts can be said to have imposed upon her, and for the violation of which she has subjected herself to penalizing damages.

The rule of legal duty applicable when the injured party is a licensee, or was in this instance a guest of the landlord, cannot be extended beyond the well-settled rule of reasonable care to avoid creating any condition upon the premises which to one of ordinary prudence and foresight could be reasonably held to be a dangerous instrumentality for harm.

Thompson in his commentaries differentiates the rule of negligence in its application to a guest of the landlord as follows: "Where one visits the private home of another as a social guest the owner is bound to take the same care of him that he takes of himself, and the other members of his family, and no more." Citing *Southcote* v. *Stanley,* 1 *H. & N.* 247; 25 *L. J. Exch.* 339.

The rule of duty, therefore, is limited to the abstention on the part of the licensor of any active wrong-doing, or as Professor Bendick states it in his *Law of Torts:* "He who is receiving the gratuitous favors of another has no such relation to him, it is said, as to create a duty to make safer or better than it happens to be the place where hospitality is tendered, the licensee must take the premises as he finds them.

At most he can claim only that the licensor shall abstain from entrapping him; shall not create new and undisclosed sources of danger without warning him of the change of situation." Citing *Corby* v. *Hill,* 4 *C. B. N. S.* 556; *Byrne* v. *New York Central Railway,* 104 *N. Y.* 362; *Harriman* v. *Pittsburg, &c., Railway,* 45 *O. St.* 11.

In this instance the door was closed when the boys entered the yard to play. Had it remained closed no injury would have ensued, but either the boys opened it or a gust of wind unexpectedly forced it open, and while it was in that condition the boy pursuing his game fell against the protruding latch and sustained his injury. If the boy had been the son of the defendant *non constat* a similar result might have followed, and her exercise of care to avoid harm would have been of no greater degree; and for all practical purposes this boy was in fact temporarily one of the defendant's family or household and legally subject to her directions. When the door was closed no legal duty was imposed upon the defendant to anticipate that a high wind or the interference of playful boys would force it open; and even if the ordinary legal rule of liability were applied, *i. e.,* a legal duty to exercise foresight to anticipate all the varied possibilities of harm or injury from every direction it is still difficult to perceive in what respect she defaulted.

If *argumentum ab inconveniente* were to be invoked, one marvels where the line of demarcation is to be drawn between the law applicable to the ordinary licensee and one who as a guest meets with a mishap as a result of sitting upon an inocuous and unsuspected chair. Indeed, the fancy might conjure up many situations of domestic bliss, which, under such a rule, could be made the basis of financial distress to the guileless and beneficent host.

But the doctrine of proximate cause also intervenes to prevent a recovery in this instance. We have a closed door with a damaged latch, which is opened through no agency of the defendant, but is either blown open by a violent wind equivalent to *vis major,* or is opened by the intervention of the boys at play in the yard. In either event the cause is not proximate so as to subject defendant to liability as the physical

agency, which actively or passively set the injurious instrumentality in motion, or created the condition which superinduced the injury.

The only evidence of alleged tort feasance in the case at bar is the defendant's retention on her garage door of the defective latch. But only by the exercise of the most vivid imagination can the exercise of that inocuous act of ownership be held to comprehend the possibility of harm or danger by the interference of playful boys, invited by her in to make use of her yard for a playground, or to comprehend the unanticipated and unexpected blast of wind which it is conceded blew the door open if the active interference of the boys did not do so.

In any event, these extraneous patent causes of a third agency remove the defendant's mere act of ownership of the defective latch as the sole basis of liability, entirely from the status of proximate cause as the efficient agency, producing the result and predicate liability entirely upon the superadded extraneous *causa causans*, without whose intervention mere ownership would be productive only of a perfectly legal existing condition, devoid of the necessary element of efficient potency capable of producing an injurious result. Thus the rule is laid down that "where the alleged negligent act is separate from the injury done by the intervention of third parties, or by the forces of nature there can be no recovery." *Smith Neg.* 12, and cases cited.

Cases illustrative of this rule might be exemplified from other jurisdictions, but this court in *Cuff* v. *Newark, &c., Railroad Co.,* 35 *N. J. L.* 17, must suffice for the purpose. We there held that "damages cannot be recovered in an action for personal injuries where an independent act of a third party intervened between the negligence (?) of defendant and the injury sustained, and but for which the injury would not have occurred." And definitive of that rule we have declared that "an intervening cause is one which destroys the causal connection between defendant's negligent (?) act and the injury, and thereby negatives liability." *Davenport* v. *McClellan,* 88 *Id.* 653.

It must be apparent, therefore, that upon a rule to show cause a verdict for the plaintiff could not be reconciled with the legal principles of liability governing the law of tort feasance, and would be vacated, and for the same reason a judgment of nonsuit in the first instance as is here presented must receive judicial approval.

The judgment of the trial court will therefore be affirmed.

*For affirmance*—The Chief Justice, Trenchard, Minturn, Black, Katzenbach, Campbell, Lloyd, McGlennon, Hetfield, Dear, JJ. 10.

*For reversal*—The Chancellor, Parker, Kalisch, Kays, JJ. 4.