338 A.2d 524.

JOSEPH A. D'AMBRA *et al. vs.* UNITED STATES OF AMERICA.

MAY 21, 1975.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

644

Doris, J. This case comes to us from the First Circuit Court of Appeals pursuant to Sup. Ct. R. 6 which prescribes a procedure for the certification of questions of law from the Federal Courts to this court. The action was originally brought in Federal District Court of Rhode Island under the Federal Tort Claims Act, 28 U.S.C. §1346(b) (1958). Constance C. D'Ambra and her husband Joseph A. D'Ambra sued to recover for physical and emotional injuries suffered by the plaintiff-wife and for losses incurred by the p'aintiff-husband, both caused by Mrs. D'Ambra's witnessing her 4-year-old son, Gregory A. D'Ambra, being struck and killed by a United States mail truck.

The factual basis of the case presently before us was settled in *Joseph A. D'Ambra* v. *United States*, C.A. No. 4545 (D. R. I., March 17, 1972), where the District Court in an

unreported opinion, determined that the driver of the mail truck was negligent, and that both Gregory A. D'Ambra and his mother, a witness to the accident and not in any physical danger, were free of contributory negligence. The case was appealed to the First Circuit Court of Appeals, which affirmed the finding of liability. *D'Ambra* v. *United States*, No. 72-1205 (1st Cir. October 24, 1972).

On the basis of the facts found in this earlier action, defendant moved under Fed. R. Civ. P. 12(b)(6) to dismiss the instant case for failure to state a cause of action. The District Court denied defendant's motion, holding that under the laws of Rhode Island, a mother who witnesses her child's death as a result of defendant's negligence, has a cause of action for negligent infliction of emotional distress if her presence at the scene of the accident is foreseeable to defendant.

The defendant has appealed this decision to the First Circuit Court of Appeals, which in turn has certified the following question of law to us:

> "May a non-negligent plaintiff mother, who is foreseeab'y in the vicinity of her minor child but not in the child's zone of danger, recover damages for mental and emotional harm, accompanied by physical symptoms, caused by observing the death of her child resulting exclusively from the negligence of defendant in driving the truck which struck the child, although she suffered no physical impact?"

Even if this question were not one of first impression for this court, the increasing division of opinion among jurisdictions over bystander recovery might well require a reexamination of any position taken previously. As it is, only a few prior Rhode Island cases touch on the problem of a parent's recovery for mental suffering caused by the awareness of injury done to a child.

In *McGarr* v. *National & Prov. Worsted Mills*, 24 R. I. 447, 53 A. 320 (1902), this court said that in an action

brought by a parent for loss of services of his child and medical expenses incurred in caring for the injuries of the child, the jury was not to consider physical or mental pain sustained by the plaintiff parent by reason of injury to the child. For a variety of reasons this case is of limited precedential significance: the case is an old one, brought before Rhode Is'and allowed recovery for mental injury; the problem of recovery for such injury does not appear to have been extensive'y argued, if at all; and the holding in the case may well be limited to the particular kind of action brought.

A second case, *Bedard* v. *Notre Dame Hosp.*, 89 R. I. 195, 151 A.2d 690 (1959), noted that as a general rule parental recovery may not be had for psychic trauma caused by an accident to a child, but did so in the context of a situation involving an intentional tort which the court was anxious to distinguish from *McGarr*. The statement of law relevant to this case is mere dicta, and again the precise question presently before this court was never briefed, argued, or directly considered.

The only Rhode Island case to seriously consider the problem of negligent infliction of emotional distress did so not in the context of a bystander problem, but in a situation where the plaintiff herself was in danger of serious physical injury. *Simone* v. *Rhode Island Co.*, 28 R. I. 186, 66 A. 202 (1907). There the court noted that a severe shock to the nervous system could be as debilitating as any physical impact, and that this effect could well be a direct result of a defendant's negligence. Given these elements of the classical tort, the court concluded that the oft stated problems of practical administration were not sufficient to bar a cause of action where a person was physically endangered by the acts of the defendant, even though no physical impact ever resulted. In Rhode Island the zone of physical danger has continued to be the high water mark of potential liability for negligent infliction of emotional distress. Only a few

jurisdictions have pushed these parameters back further to allow bystander recovery.[1] *Dillon* v. *Legg,* 68 Cal.2d 728, 441 P.2d 912, 69 Cal. Rptr. 72 (1968); *D'Amicol* v. *Alvarez Shipping Co.,* 31 Conn. Supp. 164, 326 A.2d 129 (1973); *Leong* v. *Takasaki,* 55 Hawaii 398, 520 P.2d 758 (1974).

If Rhode Island precedent does not present a bar to the extension of potential liability, it is far from providing a source of encouragement for it. Instead this court must approach the instant problem by an application of tort theory, and in so doing examine the underlying issues of policy.

The scope of potential liability commonly finds theoretical expression in such concepts as duty and proximate cause. These are, however, exceedingly elastic notions which, instead of dictating an answer to whether the plaintiff has stated a cause of action against the defendant, merely reformulate the question. They are, indeed, merely reductions of the multi-faceted mores of the community, easily expressible formuli for the core problem of whether the law will countenance a shifting of the burden of loss. As Professor Prosser has noted:

> "* * * the prob'em of duty is as broad as the whole law of negligence, and that no universal test for it ever has been formulated. It is a shorthand statement of a conclusion, rather than an aid to analysis in itself. * * * But it should be recognized that 'duty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." Prosser, *Torts* §53 (4th ed. 1971).

Likewise, Justice Andrews, in his famous dissent in *Palsgraf* v. *Long Island R.R.,* 248 N. Y. 339, 162 N.E. 99 (1928) wrote:

---

[1]*See* Prosser, *Torts* §54 at 330-34 (4th ed. 1971) for a breakdown of the rules presently in force throughout the country.

"What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. This is not logic. It is practical politics." *Id.* at 352, 162 N.E. at 103.

This court has never definitively committed itself to either of these analytical approaches, *see Radigan* v. *W. J. Halloran Co.,* 97 R. I. 122, 196 A.2d 160 (1963); nor will it do so here. It is felt, however, that given the nature of the problem, which some courts have viewed as calling for not merely an expansion of old tort concepts but a creation of an entirely new cause of action,[2] the notion of a duty of care running from the defendant to the plaintiff is the more functional approach, as it tends to focus attention on the obligation to be imposed upon the defendant rather than on the causal sequence of events. *See* Prosser, *Torts* §42 (4th ed. 1971); Prosser, *Palsgraf Revisited,* 52 Mich. L. Rev. 1 (1953). At a time when the cost burden of negligently caused injuries is still settled by a private agreement or lawsuit, this emphasis on the relationship between the plaintiff and the defendant has a solid foundation not only in our ideas of moral responsibility, but also in the present structure of the administration of justice.

Whether there exists a duty of care running from the defendant to the plaintiff is, in the first instance, a question for the court and not for the jury. *Radigan* v. *W. J. Halloran Co., supra; Mercurio* v. *Burrillville Racing Ass'n,* 95 R. I. 417, 187 A.2d 665 (1963); *Palsgraf* v. *Long Island R.R., supra; see also* 2 Restatement (Second) *Torts* §453 (1965); Prosser, *Torts* §45 (4th ed. 1971); Green, *The Causal Relation Issue in Negligence Law,* 60 Mich. L. Rev. 543 (1962). A justice of the New Jersey Supreme Court, writing in *Morril* v. *Morril,* 104 N.J.L. 557, 142 A. 337 (1928), put this proposition as follows:

[2]*Tobin* v. *Grossman,* 24 N.Y.2d 609, 249 N.E.2d 419, 301 N.Y.S.2d 554 (1969).

> "Hence, it becomes imperative before legal liability for conceded damages can be imposed upon a defendant, for the court in the first instance to inquire and determine the character of duty which the law under the facts imposed upon the defendant as the basis of liability; for manifest'y it cannot be conceded that the jury from their inner consciousness may evolve in every variety of tort feasance a legal duty as the standard of liability." *Id.* at 560-61, 142 A. at 339-40.

Underlying this position is the belief that it is the responsibility of the court to declare what the law is, to consider all the relevant factors, and to decide whether the facts as alleged make out a minimum case for shifting the burden of loss from the plaintiff to the defendant. On the practical side, the multiplicity of factors relevant to a determination of whether the plaintiff has or should have a cause of action, together with the multiple application of such notions as foreseeability in first determining duty and later breach, would all make jury instruction hopelessly complicated and involved. Moreover, jury determination of potential liability, unfettered except by some vague concept such as foreseeability, would rapidly lead to exceedingly uneven parameters of liability.

The concept of the foreseeability is often mentioned as a means to rationalize the scope of a defendant's duty. Given the wide disparity, however, between what courts have found to be "foreseeable" when faced with actual negligence problems,[3] any strong reliance on this concept as a device to distinguish close factual patterns wou'd seem to be misplaced. Moreover, while duty may be a composite of many factors, foreseeability is responsive only to the moral as-

---

[3]*Compare* New York in *Tobin* v. *Grossman,* 24 N.Y.2d 609, 301 N.Y.S.2d 554, 249 N.E.2d 419 (1969) *and* Wisconsin in *Waube* v. *Warrington,* 216 Wis. 603, 258 N.W. 497 (1935) *with* California in *Dillon* v. *Legg,* 68 Cal.2d 728, 441 P.2d 912, 69 Cal. Rptr. 72 (1968); *see also* Prosser, *Torts* §45 (4th ed. 1971).

pects of the issue; it tracks the moral postulate that one must be in a position to be aware of what one is doing before one should be held responsible for it. This is not to say that foreseeability fails as a functional concept in tort law, but only that it should not be pushed beyond its inherent limitations as a conclusion to the question of whether there exists sufficient moral culpability for legal liability to be imposed.

If foreseeability fails as an adequate template for existence of a duty, recourse must be made to the basic issues of policy underlying the core problem of whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. As the Wisconsin Supreme Court in *Waube* v. *Warrington,* 216 Wis. 603, 258 N.W. 497 (1935) stated:

> "The answer to this question cannot be reached solely by logic, nor is it clear that it can be entirely disposed of by a consideration of what the defendant ought reasonably to have anticipated as a consequence of his wrong. The answer must be reached by balancing the social interests involved in order to ascertain how far defendant's duty and plaintiff's right may justly and expediently be extended." *Id.* at 613, 258 N.W. at 501.

This court in earlier cases has used a policy analysis in deciding whether the scope of potential liability in tort should be expanded beyond its traditional confines. In the *Simone* case the court balanced the practical problems of administering the recovery of damages for fright against the recognition that even negligent infliction of emotional distress could directly cause severe physical injury. In *Ritter* v. *Narragansett Elec. Co.,* 109 R. I. 176, 283 A.2d 255 (1971), this court based its decision to adopt the doctrine of strict liability in tort on the reality of present day market conditions. Rejecting the argument that potential liability should be circumscribed by the law of contract, the court stated that, " '[t]he matter is solely one of policy and

should be approached without the encumbrance that reference to contract law needlessly imposes.' " *Id.* at 188, 283 A.2d at 261, quoting with approval *Miller* v. *Preitz,* 422 Pa. 383 at 420, 221 A.2d 320 at 339 (1966).

The policy issues relevant to the question before this court are varied in character, but for analytical convenience they may be divided into three basic categories: moral, economic, and administrative. Underlying the moral aspects of the problem is the realization, first enunciated in the *Simone* case, that physical and psychological injury are inextricably intertwined, and that psychological injury may be as debilitating as any physical injury. *See* Comment, *Negligently Inflicted Emotional Distress: The Case for an Independent Tort,* 59 Geo. L.J. 1237 (1970-71). By the terms of the question certified for our consideration, plaintiff in the instant case suffered mental and emotional harm, accompanied by physical symptoms.

Beyond the recognition of the potential seriousness of mental injury, there is a growing awareness that such injury is an increasingly common phenomenon. The modern trend of urbanization and the overall increase in density of population make serious invasion of our psychological security more and more likely. Where there is a widespread need for redress, the judicial system should consider very carefully before it undertakes to reject, as a matter of law, an entire class of claims. Hawaii, in recognizing a cause of action by a bystander for negligent infliction of emotional distress, stated:

> "* * * we are faced with a multiplication of psychic stimuli as 'society becomes more complex and people are crowded together' and with increasing widespread knowledge of the debilitating effect mental distress may have on an individual's capacity to carry on the functions of life. The force which compels recognition of an element of damages, once parasitic, as an independent basis of liability is social change." *Rodrigues* v. *State,* 52 Hawaii 156, 472 P.2d 509 (1970).

653

Certainly the law should not compensate for every minor psychic shock incurred in the course of daily living;[4] it should not reinforce the neurotic patterns of society. At some point, however, a person threatened by severe mental injury should be able to enforce his claim to reasonable psychological tranquillity.

By the terms of the certified question there is no doubt but that the negligent action of defendant in fact caused plaintiff's injury.[5] Nor is the sequence of events a multiplication of improbabilities as was the case in *Palsgraf* v. *Long Island R.R., supra.* It has often been said that potential liability should not outrun culpability, that is, the risk reasonably to be perceived. *Palsgraf* v. *Long Island R.R., supra* at 344, 162 N.E. at 100; *D'Ambra* v. *United States,* 354 F.Supp. 810 (D. R. I. 1973). Unfortunately what may

---

[4]The following cases held there should be no recovery for psychic shock or resulting physical injury, largely on the ground that a normal individual would not have been affected under the circumstances: *Caputzal* v. *Lindsay Co.,* 48 N. J. 69, 222 A.2d 513 (1966) (heart attack at sight of brownish water from faucet); *Legac* v. *Vietmeyer Bros.,* 7 N. J. Misc. 685, 147 A. 110 (1929) (the plaintiff made ill by sight of a bug in loaf of bread); *Williamson* v. *Bennett,* 251 N. C. 498, 112 S.E.2d 48 (1960) (fear for safety of child, the plaintiff imagined she had struck); *Davis* v. *Cleveland Ry.,* 135 Ohio St. 401, 21 N.E.2d 169 (1939) (major hysteria and paralysis at being caught in bus door); *Koplin* v. *Louis K. Liggett Co.,* 322 Pa. 333, 185 A. 744 (1936) (made ill by the sight of a centipede in soup).

[5]The problems in finding causation in fact should not be minimized. Given the intrinsic difficulty of determining what constitutes an unreasonable risk of mental or emotional harm, the problem of the plaintiff with a subnormal resistance to psychic trauma will continually be present. *See* Smith, *Relation of Emotions to Injury and Disease: Legal Liability for Psychic Stimuli,* 30 Va. L.Rev. 193 (1944). Furthermore, there is no escaping the problem of whether the injuries sued on should be attributed to the shock of witnessing the accident or to the fact of the victim's death. If recovery is to be allowed at all for grief resulting from the fact of the death, the question arises whether it is reasonable to tie recovery for injuries caused by extreme grief to recovery for shock, just as it has been questioned whether a cause of action for psychological injury should be tied to the possibility of physical injury.

654

be reasonably perceived or foreseen is a matter of some dispute. *See* Prosser, *Torts* §43 (4th ed. 1971). In the instant case, where a mother actually witnessed the death of her child, the resulting mental distress can hardly be deemed so fantastic or freakish as to make imposition of liability a moral outrage. Indeed, Professor Prosser has stated that in such a case, "[a]ll ordinary human feelings are in favor of her action against the negligent defendant." *Id.* at 334. Whether the mother's injury was foreseeable to defendant or "proximately caused" by his actions is a matter of conclusory definition, not of objectively verifiable fact. Other policy considerations aside, it is enough that such a plaintiff, a mother who witnessed the death of her child, has suffered severe mental and emotional distress, that such distress is not an isolated phenomenon, that it was actually caused by defendant's actions, and that the causal sequence was something less than fantastical.

Viewed from a second perspective, that of economic policy, the question is one of who can best bear the cost of the injury, which in turn may depend on the availability and cost of insurance. While it is perhaps true that insurance is more readily available to the driver than to the bystander-mother, this is not such a case as *Ritter* v. *Narragansett Elec. Co., supra,* where the economic aspects of the case were determinative. It is sufficient to note that the policy issues in this area are no bar to an extension of potential liability.

Most attempts to develop a cause of action in a bystander-mother have foundered on the rock of what was perceived to be administrative necessity. While fears of a proliferation of claims may be dismissed as "merely [showing] society's pressing need for legal redress," *Dillon* v. *Legg,* 68 Cal.2d 728, 441 P.2d 912, 69 Cal. Rptr. 72 (1968), the problem of fraudulent claims and the related issue of the difficulty of handling fairly injuries of the psyche cannot be

ignored. There are obstacles inherent in the rendering of justice on the basis of complex and often conflicting testimony from medical experts, especially where the situation is fraught with emotional appeal. It may be noted, however, that comparable problems of proof have been faced and overcome in the area of intentional torts, *see Bedard* v. *Notre Dame Hosp., supra,* and where a plaintiff is suing for psychological injuries resulting from fears for her own safety. *See Simone* v. *Rhode Island Co.,* 28 R. I. 186, 66 A. 202 (1907).

> "In the difficult cases, we must look to the quality and genuineness of proof, and rely to an extent on the contemporary sophistication of the medical profession and the ability of the court and jury to weed out the dishonest claims." *Battalla* v. *State,* 10 N.Y.2d 237, 176 N.E.2d 729, 219 N.Y.S.2d 34 (1961), quoted with approval by *Tobin* v. *Grossman,* 24 N.Y.2d 609, 249 N.E.2d 419, 301 N.Y.S.2d 554 (1969); *see also* Prosser, *Torts* §54 (4th ed. 1971); Comment: *Negligently Inflicted Mental Distress: The Case for an Independent Tort,* 59 Geo.L.Rev. 1237 (1970-71).

Furthermore, many courts, including this one, have shown themselves reluctant to bar an entire class of claims with a bright line rule merely for fear that occasionally recovery will be ill-founded. *Dillon* v. *Legg, supra; Orlo* v. *Connecticut Co.,* 128 Conn. 231, 21 A.2d 402 (1941); *Chiuchiolo* v. *New England Wholesale Tailors,* 84 N. H. 329, 150 A. 540 (1930); *see also* Throckmorton, *Damages for Fright,* 34 Harv. L. Rev. 260 (1921). As this court said in *Simone* v. *Rhode Island Co., supra:*

> "But when it is admitted * * * that in a large class of cases there may be injuries of the most serious character directly resulting from the negligence of the defendant, as a proximate cause, for which the law will afford no remedy because of some probable difficulty or occasional injustice in the administration of a more liberal rule, it appears to us that the conclusion is quite

illogical and is a pitiful confession of incompetence on the part of courts of justice."

The final issue, the one that has most troubled courts and commentators, is the question of how to draw reasonable parameters to the field of legal liability if potential liability is ever to reach beyond the zone of physical danger recognized in the *Simone* case. Despite the admitted artificiality of linking recovery for mental distress to the possibility of physical injury, this limitation does reflect the core notion of some reasonable relation or nexus between the negligent conduct and the injury sued upon. Moreover, being a rule that is relative'y easy to administer, it has the virtue of predictable application. In *Dillon* v. *Legg, supra*, the California Supreme Court suggested three factors as being relevant to the scope of potential liability: physical proximity, the actual witnessing of the accident, and the personal relationship existing between the bystander-plaintiff and the victim. The zone of physical danger is a matrix of these first two factors[6] which, although narrowly restricted in scope, covers nearly all the cases in which a bystander may recover for negligent infliction of mental and emotional injury. As such it remains a vital and viable limitation on the field of liability.

There are, however, other factors which, given the right circumstances, may be of major importance in determining whether an adequate relation exists between the defendant's conduct and the plaintiff's injury.[7] Personal relation-

---

[6]It may be noted in passing that these two factors, space and time, tend to limit recovery to cases involving sudden visual shock, while the relationship existing between the bystander-plaintiff and the victim is perhaps more relevant to the degree of grief resulting from the fact of the accident.

[7]*D'Ambra* v. *United States*, 354 F.Supp. 810 (D. R. I. 1973) added to the *Dillon* factors the requirement that the presence of the plaintiff be foreseeable. While this addition may be theoretically necessary to make the outward limits of the duty conform to the risk reasonably to be perceived (see *Palsgraf* v. *Long Island R.R.*, 248 N. Y. 339, 162 N. E. 99 (1928)),

ship may link people together more tightly, if less tangibly, than any mere physical and chronological proximity. Among such relationships, none is closer than that of mother and child. Thus, where a mother witnesses the death of her child, it is only reasonable that the parameters of liability established by the zone of physical danger be bent to accommodate the overwhelming impact of the mother's and child's mental and emotional relationship. Anything less would be to deny psychological reality.

If this relaxation of the zone-of-danger limitation on liability is viewed as the exception and not the rule, we do not find the administrative difficulties posed by bystander recovery to be insurmountable. Nor do we find any bar to an extension of liability in the economic considerations of who may best bear the risk of loss. In these circumstances, where the above external factors are not determinative, where the plaintiff has suffered severe mental and emotional distress actually caused by the defendant's negligent actions, and where this resulting injury was neither an isolated phenomenon in today's world nor the result of a freakish series of events, we feel the plaintiff's injury cannot be said to have been unforeseeable as a matter of law.

Applying the foregoing discussion to the terms of the certified question, we hold that a nonnegligent mother, who although suffering no physical impact suffers serious mental and emotional harm accompanied by physical symptoms

---

it should be realized that the scope of liability is or should be determined by more factors than those relevant only to a defendant's culpability. To require that the presence of the plaintiff or mother be "foreseeable' would mean distinguishing between the case of a very young child whose mother may be presumed to be about and the teenaged victim who is presumed to be on his own, between the young child who appears old for his age and his less physically precocious playmate, between a mother witnessing the accident from behind a tree and a mother standing in full view of the defendant-driver. While the outside limitations of the cause of action must of necessity be somewhat arbitrary, they need not be completely irrational.

from actually witnessing the death of her nonnegligent minor child as a direct result of the defendant's negligence, may maintain an action for negligent infliction of emotional distress, despite the fact that she herself was never in physical danger.

Mr. Justice Kelleher, concurring. I, too, believe that the question posed by the Court of Appeals should be answered in the affirmative. The reply, in my opinion, can be based solely on the principles of foreseeability. While the Chief Justice and my brothers Paolino and Doris discuss the issue presented to us in terms of foreseeability, their ultimate conclusion seems to rest upon a variety of moral, economic, and administrative policy considerations. I use the word "seems" advisedly. My doubt as to the actual underpinnings of their opinion is the cause for this particular literary effort.

Considerations of social policy are inherent in all tort law. It is obvious that if society does not value the right infringed upon or perceives an injury to be de minimis, recovery will not be allowed. We have, however, since *Simone* v. *Rhode Island Co.*, 28 R. I. 186, 66 A. 202 (1907), accepted the fact that psychological trauma is a disability worthy of the law's cognizance. Consequently, I do not believe that about 70 years later when confronted with a factual pattern that clearly sets out a psychic trauma with resultant physical manifestations we should now begin to assume a chary attitude toward a concept that is so well embedded in our law.

Fear of fraudulent claims, while a consideration to which we should not be oblivious, has never been used by this court to immunize one from the imposition of liability where we felt the imposition was warranted. Recently, this court has observed, "[w]e have every confidence that a juror will adhere to his oath and 'give a true verdict * * * according to the law and evidence given [him].' " *Wilkinson* v.

*Vesey,* 110 R. I. 606 at 626, 295 A.2d 676 at 688 (1972). Today, the psychiatric sciences have reached such a high degree of sophistication that the genuineness of a claim can be well explored prior to and at the time of trial. Those who view with alarm the threat of a deceitful plaintiff sell short the intelligence of the average juror as well as overlook the fact that our adversary system imposes the burden upon the plaintiff to prove his claim by the fair preponderance of the evidence.

Economic considerations did play a role in our holding in *Ritter* v. *Narragansett Elec. Co.,* 109 R. I. 176, 283 A.2d 255 (1971). However, those economic factors did not determine whether the defendants were negligent or whether a duty was owed the plaintiff. The defendants in *Ritter* were the retailer and the manufacturer of a defectively designed stove whose use could create a hazard to the user. The defendants were held to be strictly liable in tort because, having placed the product on the market, they should bear the cost of any resulting injuries. Cases such as *Ritter* rest upon a determination that traditional tort or contract concepts are inapplicable, and consequently a new rule of conduct is judicially created to remedy a wrong that up to that time was not considered susceptible of being remedied. *Ritter* was a judicial reply to society's demand that recognition and protection be afforded a consumer's right to expect a properly designed product from the merchandiser.

Here, the question can be dealt with by a straightforward intelligent application of well-reasoned, time-tested concepts. The factual situation presented to us by our brethren of the First Circuit can be resolved by resort to tort law whose terms are common and familiar to the bar and bench alike.

I must part ways with my brothers of the majority in their assertion that we have "never definitively committed ourselves to either [duty or proximate cause]" as the basis

for our tort analysis. As I read our decision in *Radigan* v. *W. J. Halloran Co.*, 97 R. I. 122, 196 A.2d 160 (1963), we unequivocably embraced the *Palsgraf* view that "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension * * *." *Palsgraf* v. *Long Island R.R.*, 248 N. Y. 339, 344, 162 N.E. 99, 100 (1928); *Radigan* v. *W. J. Halloran Co., supra* at 128, 196 A.2d at 163. We also took a similar stand in *Molinari* v. *Sinclair Ref. Co.*, 111 R. I. 490, 304 A.2d 651 (1973). Within the past weeks, we have abandoned the rigid common-law classification of entrants onto another's property and the duty of care owed to each class, and expressly adopted "foreseeability" as the test for determining the liability of a landowner to those who are injured while present on his property. *Mariorenzi* v. *Joseph DiPonte, Inc.*, 114 R. I. 294, 333 A.2d 127 (1975). The common-law rules pertaining to invitees, licensees, and trespassers had relied upon the relationship between the property owner and the injured party in terms of their economic and personal interaction as the criterion for setting the standards of care to be observed. In *Mariorenzi* the duty of due care was determined by whether or not the injury and the presence of the person injured were reasonably foreseeable to the landowner.[1]

Having determined that Rhode Island adheres to the "foreseeability of the risk" as the determinative factor in setting the boundaries of tort liability, I shall turn to the question at hand.

---

[1] It is true that we have used the term "proximate cause" in cases since *Radigan* v. *W. J. Halloran Co.*, 97 R. I. 122, 196 A.2d 160 (1963), and have even relied on it as an aid to determining liability. Although we have not been as articulate as would perhaps be desirable in our reasoning, it is clear that its use is limited to situations in which the actual causal sequence of events is at issue, *i.e.*, those involving intervening third parties. *Aldcroft* v. *Fidelity & Cas. Co.*, 106 R. I. 311, 259 A.2d 408 (1969), rather than those in which the spatial and temporal cause-in-fact is clear and the relationship between the parties is at issue.

I agree with the majority that Rhode Island case law neither bars nor dictates the result reached here. *Simone* makes clear that physical impact is not a necessary prerequisite to the recovery of damages for negligent conduct resulting in emotional trauma evidenced by physical symptoms. It is also settled that fear for his own personal safety is not required for a parent to recover for emotional distress accompanied by physical manifestations where the wrong is classified as an intentional tort. *Bedard* v. *Notre Dame Hosp.*, 89 R. I. 195, 151 A.2d 690 (1959). Although this court has not extended liability beyond these situations, I can see no reason why it shouldn't.

There is little question in my mind that the negligent conduct in this case "foreseeably involved unreasonably great risk of harm to [the witness]." 2 Harper & James, *Torts* §18.2 at 1018 (1956). Many jurisdictions have refused to acknowledge potential liability because of their fear that it will lead to limitless liability, based upon their assumption that the traditional tort concepts will not be up to such tasks as separating emotional trauma precipitated by shock from that caused by the grief and mourning that accompanies every death of loved ones and friends, or that the law will not be able to distinguish between witnesses of varying relationship to the injured. *E.g., Waube* v. *Warrington*, 216 Wis. 603, 258 N.W. 497 (1935), and *Tobin* v. *Grossman*, 24 N.Y.2d 609, 249 N.E.2d 419, 301 N.Y.S.2d 554 (1969). For this reason they have steadfastly adhered to the artificial lines drawn by such tests as that of the "zone of danger".

I have more faith in the usefulness of our tort concepts of "duty" and "foreseeability" and in the trier of fact's ability to determine what are reasonable risks and what are

valid claims of injury in any particular fact situation.[2] It seems obvious to me that it is reasonably foreseeable that a mother who witnesses the death of her young child may suffer real harm, and that such an injury can be directly tied to, and reasonably be assumed as, a probable result of a defendant's negligent operation of a motor vehicle. A witness such as plaintiff here is as much within the "zone of danger" of psychic trauma as is a witness standing in the right-of-way within the zone of physical danger. Because policy considerations do not cause me to veer from the usual implementation of tort law, my next task is to apply that law.

Justice Tobriner of the California Supreme Court has, I feel, "said it all," so, at the risk of being accused of lassitude, I will quote him at length:

> "Since the chief element in determining whether defendant owes a duty or an obligation to plaintiff is the foreseeability of the risk, that factor will be of prime concern in every case. Because it is inherently intertwined with foreseeability such duty or obligation must necessarily be adjudicated only upon a case-by-case basis. * * *
>
> "* * * In determining, in such a case, whether defendant should reasonably foresee the injury to plaintiff, or, in other terminology, whether defendant owes plaintiff a duty of due care, the courts will take into account such factors as the following: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were close-

---

[2]Such line drawing has already been performed under the test we adopt today. *Kelley* v. *Kokua Sales & Supply, Ltd.,* Hawaii, 532 P.2d 673 (1975).

ly related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

"The evaluation of these factors will indicate the *degree* of the defendant's foreseeability: obviously defendant is more likely to foresee that a mother who observes an accident affecting her child will suffer harm than to foretell that a stranger witness will do so. Similarly, the degree of foreseeability of the third person's injury is far greater in the case of his contemporaneous observance of the accident than that in which he subsequently learns of it. The defendant is more likely to foresee that shock to the nearby, witnessing mother will cause physical harm than to anticipate that someone distant from the accident will suffer more than a temporary emotional reaction. All these elements, of course, shade into each other; the fixing of obligation, intimately tied into the facts, depends upon each case.

"In light of these factors the court will determine whether the accident and harm was *reasonably* foreseeable." *Dillon* v. *Legg,* 68 Cal.2d 728 at 740, 441 P.2d 912 at 920, 69 Cal. Rptr. 72 at 80 (1968).

These factors go to the foreseeability of the risk of psychic trauma. I think that there is also need to establish the foreseeability of the presence of plaintiff-mother at the scene. Again, I will borrow from another jurisdiction's analysis of this question. In *Leong* v. *Takasaki,* 55 Hawaii 398, 520 P.2d 758 (1974), the Hawaii Supreme Court adopted a set of factors first propounded by Chief Judge Pettine in the case that has prompted this inquiry by the Court of Appeals. Hawaii's Supreme Court determined that the foreseeability of the parent's presence at the scene of the accident was to be evaluated by considering: "(1) the child's age; (2) the type of neighborhood in which the accident occurred; (3) the familiarity of the tortfeasor with the neighborhood; (4) the time of day; and (5) any other factors which would put the tortfeasor on notice of the witness' presence." *Leong* v. *Takasaki, supra* at 409, 520

P.2d 765, quoting *D'Ambra* v. *United States,* 354 F.Supp. 810, 819-20 (D. R. I. 1973).

I would employ both sets of factors in fashioning our answer to the certified question, and hold that, in consideration of these factors, it is clear that the pending question must be answered in the affirmative.

Mr. Justice Joslin, dissenting. In a result-oriented response the majority adopt a new rule of liability that, in substance, permits a plaintiff who is in a position of complete safety to recover from a tortfeasor for mental or emotional harm (if accompanied by physical symptoms) caused solely by the apprehension of an injury negligently inflicted upon a third person. I respectfully disagree.

Today's decision, as the majority suggest, can be viewed plausibly as a narrow exception limited factually to the case of a nonnegligent mother who, although outside the zone of physical danger, is not far distant when she observes an accident that causes the death of her young child. It is admittedly tempting to make that exception here because the facts are poignant and evoke substantial sympathy. I would nonetheless deny liability because I believe, as was so aptly observed in *Tobin* v. *Grossman,* 24 N.Y.2d 609, 616-17, 249 N.E.2d 419, 423, 301 N.Y.S.2d 554, 559-60 (1969), that once a court takes the initial step in a mother's case, it must be prepared to explain why the same logic and reasoning ought not apply to a similar claim of a father, grandparent, relative or other in *loco parentis,* and to any like situation in which the injured party is a fiancee, brother, sister, or lifelong friend. Moreover, any rule based solely on the claimant's being an eyewitness to the injury can be expected to endure only until a case arises involving a parent who does not actually observe the accident but either comes upon the scene immediately thereafter or receives the advice that his child has been killed or injured by telephone, word of mouth, or other means.

While there may be some cogent reasons for allowing recovery in these kinds of cases, in my opinion neither the majority nor the few courts that have adopted the new rule have adequately articulated a rational limitation upon the resultant extension of liability. Even Dean Prosser, notwithstanding his strong support for the majority's position, recognizes "* * * that if recovery is to be permitted, there must be some limitation." Otherwise, he concedes, "[i]t would be an entirely unreasonable burden on all human activity if the defendant who has endangered one man were to be compelled to pay for the lacerated feelings of every other person disturbed by reason of it, including every bystander shocked at an accident, and every distant relative of the person injured, as well as his friends." Prosser, *Torts* §54 at 334 (4th ed. 1971).

In the landmark case imposing liability, the court suggests—but I disagree—that the need for acceptable limits will be satisfied when the "* * * courts, on a case-to-case basis, analyzing all the circumstances * * * decide what the ordinary man under such circumstances should reasonably have foreseen * * * [and] thus mark out the areas of liability, excluding the remote and unexpected." *Dillon* v. *Legg*, 68 Cal.2d 728, 741, 441 P.2d 912, 921, 69 Cal. Rptr. 72, 81 (1968).

The majority, unlike my brother Kelleher in his concurrence, apparently do not fully accept the reasonable foreseeability standard. Instead, they base their exception to the zone of danger rule on "other factors * * * of major importance in determining whether an adequate relation exists between the defendant's conduct and the plaintiff's injury," and they justify this exception, in part, because here "* * * the causal sequence was something less than *fantastical*" and the injury was not "the result of a *freakish* series of events * * * ." (Emphasis added.) But I believe that these guidelines are even less helpful than the

foreseeability test, that they inadequately define the limits of liability, and that under them the resolution of future similar cases will either rest on arbitrary case-by-case determinations or result in "an entirely unreasonable burden on all human activity." Prosser, *supra*.

Prosser's answer to this dilemma—and perhaps also the response contemplated by the majority—is to confine a defendant's liability to members of the injured person's immediate family and to require either that a plaintiff be present at the time of the injury or that the shock be fairly contemporaneous with it. He admits, however, the arbitrariness of these restrictions, concedes that they lack rationality, and suggests them only as a necessary and tolerable line to be drawn lest the liability of a negligent defender be left " '* * * open to undue extension by the verdict of sympathetic juries, who under our system must define and apply any general rule to the facts of the case before them.' " Prosser, *supra* at 335.

But to adopt a rule imposing liability where none existed before, knowing that it cannot be applied even-handedly and that it wi'l therefore lead to admittedly arbitrary results, is an approach that may perhaps be appropriate in some kinds of judicial decision making but is undesirable in this context. It would, I think, frustrate a basic purpose and policy underlying scope of liability rules, namely, to achieve consistently just results by providing for even and predictable resolutions of private disputes in ways that substantially comport with general community understanding and expectations.

To achieve this objective, a scope of liability rule must be based on principles that are sufficiently generalizable so that they may be applied with reasonable certainty to comparable factual situations. And until such principles can be formulated I fear that arbitrary case-by-case determinations will result in more injustice over time than would the

uniform denial of recovery to those beyond the danger zone who do not reasonably fear for their own safety. For these reasons I agree with the great weight of authority[1] and answer the certified question in the negative.

*Abedon & Visconti Ltd., Girard R. Visconti,* for plaintiffs.

*Lincoln C. Almond,* United States Attorney, *Everett C. Sammartino,* Asst. United States Attorney, for defendant.

---

[1]Most of the cases can be found in Annot., 18 A.L.R.2d 220 et seq. (1951) and Annot., 29 A.L.R.3d 1337 et seq. (1970). The American Law Institute, which in 2 Restatement *Torts* §313 (1934) in a caveat refrains from expressing any opinion on the question, in 2 Restatement (Second) *Torts* §313 (1965), strikes that caveat and on facts substantially identical to those of the certified question substitutes a rule of nonliability.