Barbara B. CHAMPLIN

v.

The WASHINGTON TRUST COMPANY, OF WESTERLY.

No. 82–119–Appeal.

Supreme Court of Rhode Island.

July 27, 1984.

Bradford Gorham, Providence, for plaintiff.

Archibald B. Kenyon, Jr., Wakefield, for defendant.

Thomas D. Pucci, Samuel A. Olevson, Providence, for R.I. Bankers Assoc. amicus curiae.

## OPINION

KELLEHER, Justice.

The crucial issue in this appeal is whether certain conduct by the attorney representing the defendant bank is sufficient to impose liability in a Superior Court civil action in which the plaintiff seeks damages for the negligent or intentional infliction of mental distress. Our answer is in the negative, and our rationale will follow a brief recitation of the pertinent facts.

This litigation revolves around a single 1976 telephone call plaintiff, Barbara B. Champlin (Barbara), received from the attorney for defendant, The Washington Trust Company, of Westerly (the bank), in which the attorney sought payment on a series of notes allegedly executed by Barbara and her husband, Thomas Champlin (Thomas). Barbara and Thomas were married in 1954. During the next several years they became the parents of three children and the builders of a home situated on Post Road in the Matunuck section of South Kingstown. In the early 1970s, Thomas, who then worked for Electric Boat in nearby Groton, Connecticut, decided to go into business for himself. In furtherance of this goal, he formed a corporation called Noise & Vibration Control, Inc. (Vibration Control) and began "balancing turbines for the [United States] Navy." Subsequently, in 1973 the couple mortgaged their Matunuck real estate to the bank. Both Barbara and Thomas executed the requisite promissory note and mortgage deed. The couple's signatures also appear on a number of other records of the bank, including those of a joint checking account and the Vibration Control account.

Later, in April 1974, the couple separated; divorce proceedings soon followed. Matters reached the point where a final decree of divorce was entered in the Family Court in January 1975. Things worsened when in 1976 the bank foreclosed the mortgage on the Post Road property, and Barbara, who had been awarded the use of this property as part of the divorce litigation, was forced to vacate the premises and find lodging elsewhere for herself and her three children.

Thomas, who was as unfortunate in business as he had been in matrimony, instituted bankruptcy proceedings. He was adjudged and declared a bankrupt by the United States Bankruptcy Court for the District of Rhode Island in January 1977. Among the obligations discharged by virtue of those proceedings was a series of promissory notes made payable to the bank. The notes—four in number—were actually renewals of earlier notes. Each instrument was a ninety-day note.

The first note, for $8,000, was dated June 30, 1975, and bore the signatures of Vibration Control by Thomas and Barbara as makers and as endorsers. The second note, for $10,000, was dated August 25, 1975, and bore the signatures of Vibration Control by Thomas as maker and of Thomas and Barbara as endorsers. The third note, for $4,700, was dated September 8, 1975, and bore the signatures of Barbara and Thomas as makers and endorsers; and the final note, for $8,000, dated September 10, 1975, like the August 25 note, bore the signatures of Vibration Control by Thomas as maker and of Thomas and Barbara as endorsers.

When no payments were made, the bank's vice president sent a letter dated December 26, 1975, to Thomas and Barbara by certified mail, asking that they contact him about the overdue notes. The letter was received by Barbara at the Post Road

address in mid-January 1976, almost a year after she and Thomas had been divorced. Barbara discussed the bank's request with her father. On his advice she took no action. At that time the father was terminally ill, was hospitalized, and had become his daughter's chief adviser and confidant following the breakdown of her marriage. He served in such capacity until his death on February 1, 1976.

The bank, having had no success in collecting on the four notes, turned the matter over to its attorney, Thomas H. Eyles, for collection. He sent a letter dated January 30, 1976, to Thomas and Barbara, asking that they contact him about the four notes. The letter also informed the couple that the bank had set off whatever was in their accounts against the outstanding indebtedness.

The vice president had known Barbara's father and informed Eyles, the attorney, of his passing. In early April 1976 both the vice president and the attorney traveled to the Probate Court clerk's office in Little Compton and there obtained a copy of the father's will. Later, the vice president called Barbara, who was then working, at her place of employment, a small store in Wakefield. When Barbara came to the phone, the vice president turned the phone over to Eyles. Barbara testified that at this point in her life she was in "very bad shape" emotionally because of a lack of money, overdue mortgage payments, and the death of her father.

Eyles identified himself to Barbara as the attorney representing the bank, mentioned the notes, and then asked her what she intended to do about paying them. She responded by telling the attorney that she had never signed the notes. Eyles, however, took issue with Barbara's representation and informed her that he was aware of the provisions of her father's will and asked Barbara if she would be willing, as payment of the debt, to assign whatever

interest she had in her father's estate to the bank. According to Barbara, she became "terrified" at this point and told the bank's attorney to call her attorney. Barbara testified she was quite upset by the call and was unable to return to work for about "a week or so." She described herself during this period as extremely nervous, physically ill, and unable to sleep. At no point, however, did she consult a physician.

When the jury returned after completing its deliberations, the foreman gave verbal responses to written questions with which the jury had been furnished, two of which are relevant to this appeal. The jury gave an affirmative answer to the inquiry, "Do you find defendant's conduct intentional and unreasonable in the circumstances of this case?" and awarded compensatory damages of $3,000. It gave similar response to the second question, "[W]as the conduct of defendant willful, wanton, reckless or wicked so as to merit the imposition of punitive damages because of the telephone call from Mr. Eyles to Mrs. Champlin?" and awarded punitive damages of $60,000.

The decisive question in this controversy, as we see it, is what standard of liability is to be imposed upon a creditor whose actions allegedly inflict emotional distress on a debtor? There were three theories presented for the trial justice's consideration. They are set forth in the Restatement (Second) *Torts*, §§ 46, 312, and 313 (1965).[1] Section 46 imposes liability on one whose extreme and outrageous conduct intentionally causes severe emotional distress. Section 312 imposes liability on one whose conduct intentionally causes emotional distress; the conduct need not be extreme or outrageous, and the emotional distress need not be severe. Section 313 imposes liability on one whose conduct unintentionally causes emotional distress; as

1. The pertinent portions of the respective sections of Restatement (Second) *Torts* (1965) are set forth in the Appendix. The trial justice included within his charge §§ 312 and 313. The written interrogatories submitted to the jury dealt only with § 312.

in § 312, the emotional distress need not be severe.

The bank claimed in its motions for a directed verdict at the close of Barbara's case and at the close of the presentation of all the evidence that it should be held liable only under § 46. Barbara claimed instead that the bank should be liable under either § 312 or § 313.

In days gone by, this court has recognized the right to recover damages by one who has been subjected to the intentional or the negligent infliction of mental distress as long as the distress was accompanied by physical ills. *Bedard v. Notre Dame Hospital*, 89 R.I. 195, 151 A.2d 690 (1959) (intentional) and *Simone v. Rhode Island Co.*, 28 R.I. 186, 66 A. 202 (1907) (negligent). In *D'Ambra v. United States*, 114 R.I. 643, 338 A.2d 524 (1975), a majority of the justices of this court, acting pursuant to our Rule 6, gave an affirmative response when asked by the U.S. Court of Appeals for the First Circuit whether a mother who looked on, outside the zone of danger, while her infant child was fatally struck by a negligently operated truck could recover damages for "mental and emotional harm, accompanied by physical symptoms." We acknowledge these past pronouncements, but they are of no assistance to Barbara.

In *D'Ambra* it was noted that "the law should not compensate for every minor psychic shock incurred in the course of daily living; it should not reinforce the neurotic patterns of society." 114 R.I. at 653, 338 A.2d at 529. This comment highlights the fact that "emotional distress" may arise in a variety of interpersonal relationships.

Picture the problem as one individual, in speech or in writing, attempts to persuade another individual to do something that the second individual does not wish to do or is unable to do; that something in this case is to pay a debt. Such a situation demands a balancing of the interest of a creditor in collecting a debt against the interest of the debtor to be free from the infliction of emotional distress. Consequently, courts have uniformly insisted that the creditor's conduct be clearly and obviously excessive in order to sustain a claimant's recovery; "liability usually has rested on a prolonged course of hounding by a variety of extreme methods." Prosser, *Handbook of the Law of Torts*, § 12 at 57 (4th ed. 1971).

■ Those jurisdictions that permit recovery for emotional distress in the debt-collection context do so either under the higher threshhold of liability imposed by § 46, *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 4 Ill.Dec. 652, 360 N.E.2d 765 (1976); *Dawson v. Associates Financial Services Co. of Kansas, Inc.*, 215 Kan. 814, 529 P.2d 104 (1974); *George v. Jordan Marsh Co.*, 359 Mass. 244, 268 N.E.2d 915 (1971); *Watson v. Franklin Finance*, 540 S.W.2d 186 (Mo.App.1976); *Kuehner v. Denny Loan Corp.*, 518 S.W.2d 94 (Mo. App.1974); *Breeden v. League Services Corp.*, 575 P.2d 1374 (Okla.1978); or under an invasion-of-privacy theory,[2] *Norris v. Moskin Stores, Inc.*, 272 Ala. 174, 132 So.2d 321 (1961); *Ford Motor Credit Co. v. Diffey*, 378 So.2d 1032 (La.App.1979); *Housh v. Peth*, 99 Ohio App. 485, 135 N.E.2d 440 (1955), *aff'd*, 165 Ohio St. 35, 133 N.E.2d 340 (1956). We were unable to find any reported cases that used either § 312 or § 313 as the basis for holding a creditor liable for collection tactics. We join the ranks of those jurisdictions that have adopted the criteria set forth in § 46.

---

**2.** Barbara had included in her complaint a count for invasion of privacy. Such a right was not recognized in Rhode Island until the General Assembly at its January 1980 session enacted what is now G.L. 1956 (1969 Reenactment) § 9-1-28.1 (1983 Cum.Supp.). The trial justice dismissed the privacy count on the basis that the 1980 legislation was strictly prospective.

Barbara has filed an appeal from his action. We believe this facet of her appeal is moot because we are of the opinion that in establishing a violation of her right of privacy, Barbara would have had to satisfy the requirements of § 46. *See Dawson v. Associates Financial Services Co. of Kansas, Inc.*, 215 Kan. 814, 820, 529 P.2d 104, 110 (1974).

■ The higher threshhold of § 46 is required in debt-collection cases because of the belief that when a creditor or his agent is privileged to use a number of tactics to collect a debt, even though those tactics may cause the debtor to suffer emotional distress, the creditor should be held accountable only if those tactics are extreme and outrageous. In general a creditor will not be held liable when he has done no more than insist on his legal rights in a permissible way, even though such insistence is likely or even certain to annoy, disturb, or inconvenience the debtor or even cause him to suffer some emotional distress. *Dawson v. Associates Financial Services Co. of Kansas, Inc., Public Finance Corp. v. Davis*, both *supra*; Restatement (Second) *Torts* § 46, comment (g).

In the usual debt-collection case in which the debtor is permitted to recover under § 46, the creditor's action must be considered extreme and outrageous. This standard can be met by conduct of considerable duration, whether it be a long series of "dunning" letters, as in *LaSalle Extension University v. Fogarty*, 126 Neb. 457, 253 N.W. 424 (1934), and *Barnett v. Collection Service Co.*, 214 Iowa 1303, 242 N.W. 25 (1932), or a combination of letters and telephone calls, as in *George v. Jordan Marsh Co., supra*. A creditor is rarely held liable for an isolated event, i.e., a single telephone call, unless that event is such that no reasonable person could be expected to endure it. Restatement § 46, comment (j).

■ A compilation of debtor-harassment cases can be found in Annot., 87 A.L.R.3d 786 (1979) and 46 A.L.R.3d 772 (1972). Those cases make it clear that there are four elements that must coincide to impose liability: (1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe.

We would also note that conduct that is not otherwise extreme and outrageous may become so as a result of the creditor's knowledge that the debtor is peculiarly susceptible to emotional distress. Restatement § 46, comment (f). In *Dawson v. Associates Financial Services Co. of Kansas, Inc., supra*, recovery by the debtor was upheld in a situation in which she suffered from multiple sclerosis, the creditor knew this, and this condition worsened because of the creditor's attempts to collect the debt. *Watson v. Franklin Finance, supra*, involved similar circumstances, except that in that case the debtor suffered from epilepsy.

■ In this case Eyles, as the bank's agent, had every right to contact Barbara and attempt to persuade her to pay the notes. Although the jury found that the signatures purported to be hers were forgeries, there is not one shred of evidence that Eyles was aware of this before he made the call. In fact, he had a right to presume that the signatures in question were valid and had been made by her. General Laws 1956 (1968 Reenactment) § 6A-3-307. *See also McCusker v. Fascione*, 117 R.I. 478, 368 A.2d 1220 (1977); *Esposito v. Fascione*, 111 R.I. 91, 299 A.2d 165 (1973). There was no necessity for Eyles to terminate his conversation with Barbara once she denied signing the notes and then to consult a handwriting expert before making any further attempt to collect a debt due his client.

The extension of credit has played a significant role in the economic betterment of our citizens, whether the credit comes by way of a credit card, an unsecured note, a security interest in the family car, or a note that is secured by a mortgage on the family homestead. If credit is to continue to play the significant role that it does in our society, the financial community must be afforded reasonable latitude in the manner in which it seeks to collect overdue notes, even though there may be times when

those methods might cause some inconvenience or embarrassment to the debtor. In making this statement, we would emphasize that the right to pursue the debtor is not a license to outrage the debtor. *Norris v. Moskin Stores, Inc.,* 272 Ala. at 177, 132 So.2d at 323.

In this case Eyles was neither abusive nor threatening. True, at the time he called, Barbara was in a weakened emotional condition, but a part of this condition was the very reason he contacted her. Her father had died, and Eyles believed she might be inheriting a portion of her father's estate, which in turn could be used to pay off the notes. Although his request for an assignment of Barbara's contingent interest in her father's estate might seem to some to be tactless, Attorney Eyles, in making the suggestion, was merely protecting the best interests of his client. We see nothing in his brief encounter with Barbara that could be classified as extreme and outrageous.

In light of what we have said, we are of the belief that the trial justice erred when he denied the bank's motion for a directed verdict.

The defendant's appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court with instructions to enter judgment for the defendant.

## APPENDIX

1 Restatement (Second) *Torts* (1965):

"§ 46.   Outrageous Conduct Causing Severe Emotional Distress

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional dis-

tress, and if bodily harm to the other results from it, for such bodily harm."

2 Restatement (Second) *Torts* (1965):

"§ 312.   Emotional Distress Intended

If the actor intentionally and unreasonably subjects another to emotional distress which he should recognize as likely to result in illness or other bodily harm, he is subject to liability to the other for an illness or other bodily harm of which the distress is a legal cause,

(a) although the actor has no intention of inflicting such harm, and

(b) irrespective of whether the act is directed against the other or a third person."

"§ 313.   Emotional Distress Unintended

(1) If the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor

(a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and

(b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm.

(2) The rule stated in Subsection (1) has no application to illness or bodily harm of another which is caused by emotional distress arising solely from harm or peril to a third person, unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other."