64 N.J. Super. 211 (1960)
165 A.2d 790
NORA TUA AND ALFRED TUA, HER HUSBAND, PLAINTIFFS-RESPONDENTS,
v.
MODERN HOMES, INC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 21, 1960.
Decided July 15, 1960.
*212 Before Judges PRICE, SULLIVAN and FOLEY.
Mr. James H. McLeod argued the cause for defendant-appellant (Mr. Edmond J. Dwyer, attorney; Mr. James H. McLeod, of counsel).
Mr. Newton M. Roemer argued the cause for plaintiffs-respondents (Messrs. Nussman & Kaplan, attorneys; Mr. Newton M. Roemer, of counsel).
The opinion of the court was delivered by PRICE, S.J.A.D.
In a negligence action defendant seeks to reverse judgments in favor of plaintiffs entered in the District Court on a verdict of a jury in the sum of $3,000 for Nora Tua and $500 for her husband Alfred Tua, who sued per quod. The case had been transferred from the Superior Court, Law Division, by appropriate order. The respective judgments represented compensation to Nora Tua for physical injuries sustained and to her husband for consequential damages as the result of a fall suffered by Mrs. Tua when she slipped on the floor of defendant's store while she was a customer therein.
Defendant bases its appeal solely on the ground that the court erred in denying its motion for dismissal of the action at the end of plaintiffs' affirmative case, R.R. 4:42-2(b), and its motion for a judgment of dismissal at the conclusion of the introduction of the evidence. R.R. 4:51-1.
The factual situation disclosed by the record reveals that on August 26, 1957 during business hours, Mrs. Tua, 57 years of age, accompanied by her daughter and her sister, entered defendant's furniture store. Her version of *213 the factual situation follows: Her primary purpose in going to defendant's store was to purchase a chair. She did so. The three women then returned to plaintiff's automobile, parked near to the store, and the chair was placed in the car. Leaving her companions in the car, Mrs. Tua returned to the store to buy a lamp. She did so and then asked the saleslady, Muriel Israel, one of the store proprietors, who had waited on her in connection with the chair and lamp purchases, to show her such desks as defendant might have for sale. The desks shown were not satisfactory to plaintiff and she and Mrs. Israel walked toward the section of the store where the lamp which plaintiff had purchased had been left. Plaintiff described the actual accident as follows: as Mrs. Israel "was walking right alongside of me" in an aisle lined with furniture, "I stepped on this soft slippery thing that caused me to fall * * *, into something soft and slippery, a waxy substance. I was going to fall backwards and I tried desperately to regain my balance, and Mrs. Israel * * * made a grab for me, and that made me lose my balance, as I split like this here and went over all on this side here, all on my left side, and a complete split." She testified that she was then obliged to remain seated in a chair for about a half hour as her knee, injured in the fall, pained her severely. She testified that, while seated, she looked at the place where she had slipped and fallen and "I saw * * * a yellow waxy substance that looked like wax" on the floor. The waxy substance was "spread in the center. * * * In the center * * * it was a waxy, soft looking, but on the edges and around the side it was dry, because she [Mrs. Israel] had to scrape it in order to get it off the floor. * * *" It was "soft in the center; and hard on the sides. * * * the part that I stepped in was a little bigger than a half a dollar * * *." She further testified that the substance was "crusted hard on the outside, on the edges of it * * *" and "soft" where she "stepped." She added: "* * * [I]t was a *214 soft, slippery thing in the center. On the outer * * * looked like an egg yolk because it was encrusted into the thing * * *. The lady of the store cleaned it up * * *. She took something from this * * * table * * * and did it with it. She had to scrape it because she took the soft part up with paper, but the other that was around the edges, that was encrusted into there, she had to scrape that."
Plaintiff further testified that she saw wax on the sole of her left shoe. She observed this when she attempted to stand, assisted by Mrs. Israel and her sister who had returned to the store. She said: "[M]y foot started to slide * * *. So then I passed my hand, underneath my shoe, and I seen the greasy yellow substance. And I had that all smeared over my hand, and my sister gave me a handkerchief to clean my hands with." She added that, earlier, Mrs. Israel had given her some paper "to clean my shoe, but I still must have had some left, underneath, because I was still sliding, was going to slide when they helped me up to go to my car."
Further testifying on direct examination, plaintiff said that while she was seated in the chair she saw "a big floor waxer, standing up against the booth, and the reason why it attracted me, because it was a bright red; big floor, commercial waxer, up against the booth of the store."
On cross-examination she said that she had not experienced any other slippery place in the area of the store where she had walked; that the aisle where she walked "had red linoleum tile on it." She further testified that at the time of the accident she wore low-heeled shoes.
The sister of plaintiff, Frances Drache, who had not witnessed plaintiff's fall, testified that, on re-entering the store to ascertain the cause of plaintiff's delayed return to the automobile, she found her seated in a chair and that on inquiry Mrs. Israel stated that Mrs. Tua had "slipped and twisted her knee." Mrs. Drache testified: "I tried to help my sister up and I put a hand under her elbow *215 and she kept slipping, so I let her down again. * * * I handed it [my handkerchief] to her and she was wiping the bottom of her shoe * * *. [S]he sat up again * * * and she cleaned her hands with it instead * * *. It [the handkerchief] was badly smeared. It was yellow and brownish * * * looked gummy to me." She did not testify to the presence of a waxer nearby.
Plaintiff's daughter, Linda Tua, who said that she temporarily remained in the automobile when Mrs. Drache returned to the store, testified that she then re-entered the store and saw that her mother slipped when she attempted to arise; that she had a "waxy substance on her hand * * * and I saw * * * she was wiping it off her hand * * * it was on the handkerchief."
Following the denial of defendant's motion for dismissal at the end of plaintiffs' case, defendant called Mrs. Israel as its sole witness. Most of the crucial testimony presented by plaintiff, her sister and her daughter was flatly contradicted by Mrs. Israel. She denied that plaintiff had purchased a lamp. She presented her sales book which contained a record of the purchase of the chair but no record of the purchase of a lamp. She testified that plaintiff had been in the store only once that day; had purchased a chair only, then departed and had not re-entered the store. Mrs. Israel denied that she had seen plaintiff's daughter at all but did see Mrs. Drache. She categorically denied that she had seen plaintiff fall. Her story was that, while preceding plaintiff as they were walking toward the front of the store, she heard plaintiff exclaim. She turned and saw her seated in a chair about 10 or 12 feet away. "She was holding her left ankle" and the following conversation ensued:
"* * * I said to her, `What is the matter?' And she said, `I fell,' and I said, `You fell? How? Where?' And she pointed, and she said, `I fell back there. It is slippery,' and I said, `Where is it slippery? Show me,' and she said, `Over there, there it is slippery,' and I said, `I don't see anything slippery.' I said, `You may have turned your ankle, and it is no wonder,' and then I started to lecture her on the type of shoe she was wearing for her build *216 and stature. She had her feet, which were a little on the heavy side, in a tight red pump, with a very thin heel, not a high heel but a very thin heel, and I said to her, `You should wear the kind of shoes I wear,' and I pointed to my shoes which were oxfords and I said, `This is the type of shoe for a woman of your build,' and she sat there for a few minutes more and then got up and continued to make the purchase of the chair."
Mrs. Israel further testified that she looked at the section of the floor to which Mrs. Tua pointed and saw nothing on it. She denied that she saw plaintiff on the floor in a "split" or "any other position"; that she did not "grab" her at any time; that Mrs. Tua remained seated in the chair only a few minutes and then arose and "browsed around a little more" without difficulty in walking, selected the chair she desired, the bill was prepared, plaintiff paid it and left. At no time did she see Mrs. Tua wipe anything from the bottom of her shoe and she denied that there was any conversation with Mrs. Drache about wiping plaintiff's shoe. Mrs. Israel further denied that she had given plaintiff any paper to clean her shoe. A "wholesale furniture representative" who happened to be in the store, Mrs. Israel said, carried the chair to plaintiff's automobile "and tied it down for her." She added that Mrs. Tua had no difficulty whatever in leaving the store and going to her car; that Mrs. Israel first knew that Mrs. Tua claimed to have been "hurt" when Mrs. Tua called "two weeks later to tell me that she was under a doctor's care."
Mrs. Israel testified that the floor was covered with asphalt tile; that defendant had operated the store for five years; that during that time the floor had been waxed only twice, each time by a professional waxing service company; that the floor was "mopped" about once a month and broom-swept every day; that defendant never owned or rented or possessed a waxing machine; that there was no waxing machine (red or any other color) on the premises on August 26, 1957; that for taking care of the furniture a liquid cream was used and that nothing in the nature of "solid wax" or "grease" was used.
*217 It was against the background of plaintiffs' proofs and the evidence submitted on behalf of defendant that defendant's motion for dismissal at the end of plaintiffs' case and its motion for a judgment of dismissal at the end of the entire case respectively were made. As stated, the denials of those motions are the sole grounds urged for reversal of the aforesaid judgments.
In considering the propriety of the trial court's action we "must accept as true all evidence which supports the view of the party against whom the motion is made and must give him the benefit of all inferences which may logically and legitimately be drawn therefrom in his favor." Gentile v. Public Service Coordinated Transport, 12 N.J. Super. 45, 49 (App. Div. 1951); Mellon v. Pennsylvania-Reading Seashore Lines, 7 N.J. 415, 419-420 (1951). Defendant, in its brief, contends that the "case was improperly given to the jury * * * in that the effect of the same was to authorize the jury to decide the responsibility of the defendant on the basis of speculation and conjecture." It relies on Hansen v. Eagle-Picher Lead Co., 8 N.J. 133, 141 (1951), holding that "existence of a possibility of a defendant's responsibility for a plaintiff's injuries is insufficient to impose liability" and that "[w]hile proof of certainty is not required, the evidence must be such as to justify an inference of probability as distinguished from the mere possibility of negligence on the part of the defendant."
In assaying the correctness of this contention we are governed by the well settled principle that "[w]here fair-minded men might honestly differ as to the conclusions to be drawn from the proofs, the questions at issue should be submitted to the jury." Mellon, supra, 7 N.J., at p. 420; Fischetto Paper Mill Supply, Inc. v. Quigley Co., Inc., 3 N.J. 149, 154 (1949). See, also, Shellhammer v. Lehigh Valley Railroad Co., 14 N.J. 341, 345 (1954).
Defendant urges that there was no evidence adduced at the trial which, with permissible derivative inferences, legally justified the submission of the question of the alleged liability *218 of defendant to the jury, either on the basis of actual or constructive notice of the asserted dangerous condition of the floor.
Primarily defendant places its reliance on the case of Simpson v. Duffy, 19 N.J. Super. 339 (App. Div. 1952), certif. den. 10 N.J. 315 (1952), while plaintiff relies on Torda v. Grand Union Co., 59 N.J. Super. 41 (App. Div. 1959). Because of the factual differences between the cited cases and the case at bar neither Simpson nor Torda is controlling here.
Initially we consider Torda, in which, as disclosed in the opinion (59 N.J. Super., at p. 42), a customer of defendant's supermarket was injured. While pushing a cart near a self-service vegetable bin, she slipped on something which she did not see. The opinion discloses (59 N.J. Super., at pp. 42-43) that there was water on the floor at the place where she fell. Another customer observed a "leaf of lettuce and a skid mark" where plaintiff had fallen and stated that the place of plaintiff's fall was "very close" to the vegetable bin. This witness added that she noted that the water on the floor came from ice melting in the bin.
In Torda, reversing the trial court's action granting defendant's motion for an involuntary dismissal, we stated (59 N.J. Super., at p. 44) that the factual situation was in contrast with that existing in Simpson, supra. Although in the latter case plaintiff, also a customer in a self-service market, suffered personal injuries as the result of slipping on a vegetable leaf, a judgment of involuntary dismissal was upheld because, as we noted in Torda, supra (59 N.J. Super., at p. 44), the record in Simpson was found to be barren of evidence from which a determination could be made whether "the leaf was dropped on the floor by an employee of the defendant or by a customer and, even in the event that the latter could be inferred, that the leaf was on the floor for a sufficient length of time to constitute constructive notice of its presence." In Torda we further emphasized the factual difference by stating (59 N.J. Super., at pp. 44-45):
*219 "* * * The court observed in Simpson that since both customers and employees handled the vegetable matter in the ordinary course of the transaction of business, the submission of the questions of who had caused the leaf to be on the floor and how long it had been there would have been `to authorize and direct the jury to decide the responsibility of the defendants on the basis of speculation and conjecture,' id., 19 N.J. Super., at page 345, and so would have run afoul of the accepted principle recently reiterated in Hansen v. Eagle-Picher Lead Co., 8 N.J. 133 (1951), that `the evidence must be such as to justify an inference of probability as distinguished from the mere possibility of negligence on the part of the defendant.' Id., at page 141.
The evidence here was susceptible of an inference that the plaintiff came to her injury because there was water on the floor at a point immediately adjacent to an open bin in which defendant for its own purposes had seen fit to place a quantity of ice. While there was no direct proof as to the fact, it was legitimately inferable that the source of the water on the floor was the ice-filled bin. Thus as distinguished from the Simpson case, evidence of how the hazard came into being was not left in a state of equipoise.
Defendant argues that it was inferable that the water fell to the floor as the result of the handling by the customers of wet vegetables which they had taken from the bin. We accept this premise. It is then urged that such finding could not be made the basis of liability unless it was established that the defendant had notice, actual or constructive, of the presence of the water. With this we cannot agree since the fact finders might reasonably have concluded that the hazard to business invitees, thus engendered, constituted a risk of harm within the reasonable foresight of defendant and therefore it should have employed a method of refrigeration to obviate this danger or should have taken other means of keeping the floor in a reasonably safe condition. See 2 Harper & James, The Law of Torts, § 16.5, at page 915 (1956). Compare Martin v. Bengue, Inc., 25 N.J. 359, 371 (1957)."
In the case at bar we find no evidence: (a) justifying an inference that defendant had actual notice of the presence of the wax on the floor; or (b), in contrast with Torda, any proof that defendant had engaged in a course of conduct which, with reasonable foresight, it might have perceived would create a condition which would constitute "a risk of harm" to others.
Therefore, although Torda cannot be deemed supportive of the trial court's challenged ruling in the case at bar, the factual dissimilarity existing in Simpson, supra (19 *220 N.J. Super. 339), renders that case equally inapposite in upholding defendant's appeal. Evidence, absent in Simpson, is present in the instant case. As expressed in Simpson (19 N.J. Super., at pp. 343-344) and, as noted in Torda, supra (59 N.J. Super., at p. 44), "no facts were adduced [in Simpson] from which an inference could be drawn that it [the vegetable leaf] had reposed there for such time as would have permitted the store operator to have discovered and removed it, had the duty of reasonable inspection been fulfilled."
Apart from Mrs. Tua's testimony in the instant case that she saw a large red "waxing machine" in the store, which evidence might be labeled as tenuous and of dubious significance in justifying an inference that defendant's acts were responsible for the waxy substance on the floor, we note other evidence on which plaintiffs most heavily rely. Weak as plaintiffs' proofs are in the case at bar, they include direct testimony by Mrs. Tua that the "wax" into which she stepped on the floor aisle was soft in the center and was so "encrusted" around the edges as to require Mrs. Israel to use an implement to scrape the "encrusted" substance from the floor surface. This evidence was sufficient to justify the very inference of the existence of the offending substance on the floor for a protracted period of time  an inference which, as above noted, could not be drawn in Simpson. See, Annotation, Debris on Floor  Injury, 61 A.L.R.2d 6, § 7(c), at p. 38.
The judgments are affirmed.
FOLEY, J.A.D. (dissenting).
The basic theory of liability advanced by the plaintiffs was that the defendant had constructive notice of a waxy substance on its floor. Specifically plaintiffs urge that the physical condition of the substance itself was of such a nature as to evoke a reasonable inference that it was present on defendant's floor for a sufficient time to constitute constructive notice of its presence. It is contended that this premise is supported *221 by the testimony that the substance was encrusted around its edges and that it adhered to the floor. On this basis the majority holds, as I interpret their decision, that it is reasonable to infer that the wax had been exposed to air for a considerable period of time (and in effect was old wax) and that at least a sufficient period of its exposure occurred while it was on defendant's floor, so as to constitute constructive notice of its presence.
I have no disagreement with the legal principles recited in the majority opinion respecting the obligation of the court to accord to the jury the exclusive right to determine which of the conflicting legitimate inferences from proven facts should be accepted and made the basis of decision. Also I give full recognition to the basic principle that where fair-minded men may differ as to the conclusions to be drawn from the proofs the issues should be submitted to the jury.
My disagreement with the majority stems from a belief that under the facts of this case, the judge was under a duty to withdraw the case from the jury's consideration.
The problem involved is not one of easy solution and, as was noted by Judge (now Justice) Francis in Overby v. Union Laundry, 28 N.J. Super. 100, 109 (App. Div. 1953 (dissenting opinion):
"The line of demarcation between the function of the court and the function of the jury is sometimes evanescent. In such cases where the one ends and the other begins may appear to be almost a sensory perception rather than a reasoned one."
In the same case Judge Jayne, writing for the majority, further emphasized the significance of this problem when he said:
"Unless rationally governed, the modern social tendency to afford redress for every unfortunate injurious mishap regardless of fault or dereliction will soon squeeze the law of negligence out of existence." Id., at p. 108.
*222 These declarations bring into bold relief the importance of the proper exercise by the trial judge of his duty in a proper case to remove the matter from the jury's determination.
In a constructive notice case such as confronts us here, where there is no evidence as to the length of time the injuring object or substance was present, and where the facts and reasonable inferences to be drawn therefrom are undisputed, it is the duty of the trial court in the first instance to determine if reasonable care was exercised under the circumstances. Schnatterer v. Bamberger & Co., 81 N.J.L. 558 (E. & A. 1911). Compare also Bader v. Atlantic & Pacific Tea Co., 112 N.J.L. 241 (E. & A. 1934); Tomsky v. Kaczka, 17 N.J. Super. 211 (App. Div. 1952); Sinton v. Hudson & Manhattan R. Co., 131 N.J.L. 331 (Sup. Ct. 1944).
In applying this rule the judge must carefully assay the evidence before him and reject mere conclusions of the witness concerning the condition of the foreign substance unless such conclusions are supported by competent evidence. In Gaskill v. Van Ravesteyn, 127 N.J.L. 205 (E. & A. 1941) the plaintiff's assertion that celery on which she slipped "was not perfectly fresh" was rejected as a "mere conclusion." Likewise in Baker v. North Jersey Street R. Co., 77 N.J.L. 336, 338 (Sup. Ct. 1909), the court rejected the plaintiff's observation that the ice on which she slipped "looked like old ice," saying that the remark was "mere conjecture" and "proved nothing."
It is settled law in this State that the authority of the court to grant a motion for a judgment of involuntary dismissal does not depend upon a complete absence of testimony in support of the claim. Rather the test is whether there is any testimony from which the jury can reasonably conclude that the facts sought to be proved are established. Township of Parsippany-Troy Hills, Morris County v. Bowman, 3 N.J. 97, 107 (1949) (concurring opinion); McMillan v. Mather, 131 N.J.L. 309, 310 (E. & A. 1944); *223 Gaskill v. Van Ravesteyn, supra; Pellington v. Erie R. Co., 115 N.J.L. 589, 592 (E. & A. 1935); Kurtz v. Oremland, 33 N.J. Super. 443, 457-458 (Ch. 1954) affirmed 16 N.J. 454 (1954) (per curiam); Wallace v. Delaware River Ferry Co., 127 N.J.L. 513, 515 (Sup. Ct. 1941) affirmed 130 N.J.L. 216 (E. & A. 1943), cert. denied, 320 U.S. 760, 64 S.Ct. 68, 88 L.Ed. 453 (1943).
While it may be said that the modern tendency of courts to expand the area of jury determination is in keeping with the democratic processes which juries serve, in my judgment the expansion should not be at the expense of depriving litigants of the security they derive from the informed, thoughtful and experienced determination by a trained judicial mind of what on the facts of a given case can be decided by reasonable men logically and rationally, and what can be determined only by guesswork.
Restated, the central determination of constructive notice as it applies to this case is not how old the substance was nor how long it was exposed to air but rather how long it can be inferred it was present on defendant's floor. It is axiomatic that in order to be valid inferences must be logically deducible from the proven facts. See Simpson v. Duffy, 19 N.J. Super. 339, 347-348 (App. Div. 1952); Radio Officers' Union v. N.L.R.B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954) as commented on in 42 Geo. L.J. 565 (1954). Simply stated, I do not think that from the testimony that the wax was encrusted and possessed adhesive characteristics, it can be logically deduced that the substance had taken on the appearance of age or the quality of adhesiveness as a result of its having remained on the floor for an unduly prolonged period of time. See Annotation, 61 A.L.R.2d 6, 38 (1958). In the first place we are not apprised by plaintiffs of any of the physical properties of this substance. Hence we cannot tell how long it would take for such an encrustation to occur. Assuming it was wax does not solve the problem, for I am unaware that it is common knowledge *224 that there is no wax which will not encrust unless it is permitted to remain on a floor for a period of time. Indeed for all that appears in the proof, even assuming the substance to have been wax, there was no evidence that encrustation was not a quality of the substance as it was originally prepared.
Secondly, the absence of proof of the inherent properties of the substance renders entirely speculative the relation between the adherence to the floor and the length of time it had been present thereon prior to the accident. For all we know from the proof the same adhesive effect might have been produced if the substance had been dropped on the floor a moment before the accident occurred, or when Mrs. Tua stepped on the substance the force of her weight might have caused the adherence.
I therefore conclude that neither the appearance of the substance as it may have suggested aged debris, nor its adherence to the floor can properly be said to have fulfilled plaintiffs' undoubted burden to establish by rational inference that it remained on the floor prior to the accident for such a period of time as to charge the defendant with notice of its presence and so to call for its removal.
In these circumstances the applicable law required the trial judge to grant defendant's motion for involuntary dismissal. Accordingly, I would reverse.