**Mary FINCH, Plaintiff,**

v.

**B. Elliot PERS,[1] Pauline Pers, 2100 Linwood Ave. Owners, Inc., Mediterranean–Towers, and Security Operations Systems, Inc. a/k/a S.O.S., Inc., Defendants.**

**No. 92 Civ. 5109 (BN).**

United States District Court,
S.D. New York.

Jan. 4, 1994.

---

1. On stipulation of the parties, the action was dismissed as to defendant B. Elliot Pers, who had long been deceased at the time the action was commenced.

Fred L. Abrams (Peter Verby, of counsel), New York City, for plaintiff.

Quirk and Bakalor, P.C. (Veronica Mandel, of counsel), New York City, for defendants B. Elliot Pers and Pauline Pers.

Killarney, Feller, Haber & Salmon (Howard S. Shafer, of counsel), New York City, for defendants 2100 Linwood Ave. Owners, Inc. and Mediterranean Towers.

Law Office of Paul Cohen (Russel Monaco, of counsel), New York City, for defendant Security Operations Systems, Inc., a.k.a. S.O.S., Inc.

## OPINION OF THE COURT

NEWMAN, Senior Judge of the United States Court of International Trade, sitting as a United States District Court Judge by designation:

### INTRODUCTION

This is a negligence action tried to a jury under the court's diversity jurisdiction (28 U.S.C. § 1332(a)) wherein plaintiff, a resident of The Bronx, New York, seeks recovery of damages for personal injuries sustained when she was blown down by a sudden gust wind on the premises of the defendant cooperative apartment building known as Mediterranean Towers, in Fort Lee, New Jersey.

At the completion of the opening statements, defendants moved for a judgment of dismissal as a matter of law pursuant to Fed.R.Civ.P. 50(a). In order to afford plaintiff a full opportunity to present her case, defendants' motions were denied at that time. At the conclusion of plaintiff's evidence, defendants again moved for judgment as a matter of law, and the motions were granted as to all defendants, with this opinion to follow stating the basis for granting defendants' motions.

### THE FACTS

At trial, plaintiff submitted, in addition to photographs and other documentary exhibits, the testimony of Mary Finch ("Finch"), Pauline Pers ("Pers"), Mitchell Kaphan, M.D., an orthopaedic specialist and plaintiff's treating physician, and Richard F. Newhouse, P.E., a New York State Throughway traffic safety engineer. On defendants' motions for judgment as a matter of law, the court is required to consider all the evidence admitted at trial viewed in the light most favorable to plaintiff, and give plaintiff the benefit of all reasonable inferences to be drawn from that evidence. In light of the foregoing, the critical facts are:

The defendant Pers is, and at the time of the accident in issue was, a tenant residing at Mediterranean Towers in Fort Lee, New Jersey, a high-rise residential building owned by the defendant cooperative corporation,

2100 Linwood Avenue Owners, Inc. ("the coop"). Pers rents her apartment from a tenant-shareholder of the coop. The coop employs defendant Security Operations Systems, Inc. ("S.O.S.") to provide security and safety services for the building.

On April 3, 1992, the date of the accident, Mary Finch then 85 years of age had been since 1973 (19 years prior the accident) employed by Pers, then 77 years of age, as a part-time domestic housekeeper. At the time of the accident, Finch lived alone, was in good health, claimed that she had no difficulty walking, was fully ambulatory and travelled easily without assistance, and was otherwise unrestricted in all activities she wished to pursue. Even following the accident, Finch was still able to do most of the activities that she formerly pursued, some activities like shopping with difficulty because of her wrist fracture injury.

Over a period of many years and up to the date of the accident, Finch regularly left her home in The Bronx, New York to go to work at 7:00 A.M., traveled for some two hours by three buses (walking from bus to bus). Finch regularly performed domestic cleaning services for three or four hours on Fridays for Pers, and also worked one day each week for Pers' sister. Finch testified that she earned $40.00 per day. After work, Finch returned home in the same manner as she traveled to Fort Lee.

Pers had been for many years employed, initially by her husband physician until his death some 14 years ago, and after his death, Pers worked as a medical receptionist in the offices of other physicians. Because Pers herself was regularly employed and frequently was not at home at the time Finch arrived for work and left to return home, Pers provided Finch with a key to the apartment, and Finch would arrive and leave entirely on her own without seeing Pers. However, from time to time Pers was at home while Finch worked, and Pers provided Finch a ride in her automobile to the nearby George Washington Bridge Plaza bus stop in Fort Lee where Finch obtained bus transportation to The Bronx.

At the end of Finch's work day on April 3, 1992, Pers was at home and offered Finch a ride to her bus connection at Bridge Plaza. As Finch had a key to the apartment, Pers left the apartment ahead of Finch for her automobile to meet Finch at the front of the building. Pers then drove into the curved, almost semicircular, driveway in front of the building to wait for Finch to come down from the apartment.

As is evident from the photographic exhibits in evidence, Mediterranean Towers is a very large 25 + floor high-rise residential structure. At the front entrance area to 2100 Linwood Avenue there is a masonry canopy sloping upward supported by two vertical V-shaped masonry or stone columns and horizontal supporting members. The obvious purpose of the canopy is to provide at the front entrance of the building an aesthetically pleasing structural configuration for protection from the elements. The canopy covers the front entrance pedestrian walkway of some 15 feet in width and a portion of the curved driveway approximately 20 feet in width. Directly under the canopy, are "curb cuts" that provide an opening in the curb for persons in wheel chairs or who are physically disabled for which the height of the curb would be an impediment to their mobility. However, there is no evidence that Finch was unable to step down from the sidewalk into the driveway, was otherwise unable to access the driveway without a curb cut, or that the presence of absence of curb cuts had any relevance whatever to her mobility or accident.

From photographs admitted into evidence, the canopy appears to be some 12 to 15 feet in height over the front walkway, and somewhat higher over the driveway. Except in the area under the canopy directly between the V-shaped masonry or stone supporting columns, the canopy area is wide open on three sides. Significantly, the 15 foot wide pedestrian walkway immediately in front of the building continues far beyond the canopy in both directions, is totally uncovered, and there is no evidence of any prior safety problem due to wind currents for pedestrians in the uncovered areas of the driveway or front sidewalk. Approximately five feet from the end of the canopy and parallel thereto is a

masonry wall that appears to be approximately eight feet in height.

On the driveway there are painted in large yellow letters, "No Parking" and "Fire Lane." These parking restrictions apply to the entire driveway area including that directly under the canopy. Photographs in evidence also demonstrate that, at most, only two vehicles can at any given time stand at the curb directly under the canopy. According to Pers' testimony, in order to keep the driveway area directly under the canopy at the front entrance as free of standing vehicles as possible, security personnel direct drivers who are not immediately engaged in picking up or discharging passengers to move away from under the canopy to wait for their passengers in the uncovered areas of the driveway. Mr. Newhouse, who testified for Finch as a *traffic safety expert*, stated that the "safest place to stop and pick up a passenger would be directly under the canopy." (Tr. 97).

Significantly, Newhouse is a traffic safety engineer and not an architectural expert, and hence, Newhouse could offer no competent expert testimony respecting the impact of structural configurations such as the canopy on wind currents. Nor could Newhouse offer competent meteorological evidence concerning prevailing wind velocities and directions in the canopy area and in the uncovered areas of the sidewalk and driveway in front of the building. There is no evidence on the record concerning the wind velocity and direction at the time of the accident.[2] Indeed, Newhouse offered no testimony whatever that the canopy provided significant protection from strong gusts of wind regardless of velocity or direction, and Newhouse admitted he had taken no measurements, but agreed that there was "some [open] distance" between the building and the first support column under the canopy (Tr. 141).

Pers, a long-time resident of the building, opined based on her own observations and experience, that persons were not protected from the wind under the canopy as it was open and held up only by "posts" (columns). Nonetheless, inferring from Newhouse's testimony that from the standpoint of wind protection, the area directly under the canopy was the safest area for pick up and discharge of passengers, still there is no testimony by Newhouse that the uncovered areas of the front sidewalk and driveway were unreasonably hazardous for pedestrians *due to gusts of wind*.

When Pers' vehicle entered the driveway immediately before the accident, other vehicles were already standing directly under the canopy (as previously indicated, there is space for only two vehicles at a time directly under the canopy), she passed by the front entrance canopy and waited for Finch in her vehicle within a few feet past the canopy (according to the S.O.S. security report, Pers' testimony and exhibit B).

Pers testified that on April 3, 1992 while she was waiting for Finch, there were other standing vehicles directly under the canopy to the rear of her vehicle and in front of her vehicle. Pers also testified that she was unaware of any house rule at the coop requiring that incoming vehicular traffic get on line in the driveway leading up to the canopy and wait for a space directly under the canopy before picking up or discharging a passenger.

On April 3, 1992, after Pers left the apartment for her car, Finch locked up the apartment, went down the elevator, passed quickly through the lobby and passed the doorman at the front entrance, and without stopping, she exited the building through the revolving door carrying a shopping bag in each hand. Finch did not request assistance of the doorman, security personnel, or any other person when exiting the building. The S.O.S. secu-

---

2.  Mr. Newhouse described the job of a traffic safety engineer as follows: "Traffic safety engineer basically looks at the operations of highways and roadways, looks at accidents and basically tries to make the roadways safer for motorists, pedestrians and bicyclists." Newhouse proffered no testimony in this case concerning any access, traffic flow, auto accidents, parking or safety problems with the coop's driveway or how the driveway could be made safer. Nor are such problems relevant in this case. Plainly, Newhouse had no demonstrated expertise in the protection of pedestrians exiting the building from wind currents at the premises. Plaintiff's counsel conceded that Newhouse was testifying as a "traffic expert" and not a "wind expert" (Tr. 85).

rity report states that April 3, 1992 was "very windy day," and that "Pers' vehicle was "just beyond the front canopy." Finch's own testimony confirms that Pers' car was "not too far" from the front entrance (Tr. 23). Neither Finch nor Pers noticed strong wind gusts at the point in time when Finch exited the revolving door of the building.

According to Finch, as she approached Pers' vehicle, Pers was "sitting in the car behind the steering wheel waiting for me" (Tr. 24). On close questioning by counsel for plaintiff, Pers flatly denied that she had either beckoned to or by gesture encouraged Finch to come out of the building to Pers' car. Finch testified that before she got to Pers' car, she could not even see Pers, as the latter was "sitting under the steering wheel" (Tr. 24).

As Finch approached Pers' auto, a sudden gust of wind blew against her, she became unsteady and then apparently lost her balance and fell to the pavement. According to the S.O.S. security report, a security supervisor (Jose Alonso) and another gentleman ran over to help Finch up. Pers also immediately rushed around her vehicle to Finch's assistance and to help her up from the pavement. The S.O.S. security report indicates that Finch was asked if she was O.K. and Finch responded, "yes, I'm fine," got into Pers' car and was driven away. Finch, however, testified that she was taken home in a Yellow Cab. In any event, when Finch arrived at home she called Pers to advise her that she had returned safely and that she "felt fine" (Tr. 26). It was not until the following morning that Finch noticed that her right wrist had become painful and swollen.

Finch was thereupon taken to Lincoln Hospital in an ambulance, where according to the medical evidence, she was treated for a fracture of the distal radius of the right arm (in the area of the wrist), placed in an arm cast, remained under observation for four days, and then was discharged. Finch subsequently visited an orthopedic surgeon who removed the cast, prescribed physical therapy and examined Finch at follow up visits, the last shortly before trial. Finch testified that since her accident, she has been unable to work, will be unable to ever go back to work, and because of her injury, she has difficulty using her right hand when shopping.

Finch also testified that on or about October 25, 1993, she slipped and fell on soap in her bathtub and was unable to extricate herself by pulling herself up. She remained in the tub until her attorney, Mr. Abrams, discovered her plight when he visited her apartment. Abrams called the police who came and extricated Finch from the tub. Finch was again hospitalized at Lincoln Hospital for a few days for observation and then discharged to her home. The trial scheduled for October 26, 1993 was twice postponed at plaintiff's request and voir dire of the jury commenced on December 9, 1993.

## DISCUSSION

### 1.

In granting defendants' renewed motions for judgment as a matter of law at the conclusion of plaintiff's case, this court considered all the evidence admitted at trial viewed in the light most favorable to plaintiff, and gave plaintiff the benefit of all reasonable inferences to be drawn from that evidence. Based on all of the foregoing, the court was compelled to conclude that as a matter of law plaintiff was not entitled to prevail on her claims against any of the defendants.

### 2.

Under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this court must apply the substantive law of the State, and there is no dispute that in this case involving liability for an accident that occurred in New Jersey, the court must look to the law of New Jersey. *See Rustay v. Consolidated Rail Corp.*, 775 F.Supp. 161, 163 (D.N.J.1991); *GNOC Corp. v. Aboud*, 715 F.Supp. 644, 652 (D.C.N.J.1989). As stated in *GNOC Corp.*, 715 F.Supp. at 651: "Under New Jersey law, '[n]egligence is tested by whether the reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others.' " [citation omitted]

### 3.

As a threshold inquiry in a negligence case, the court must first determine, as a matter of law, whether a duty exists with respect to the particular claimant.

In *Emily S. Hopkins v. Fox & Lazo Realtors,* 132 N.J. 426, 625 A.2d 1110 (1993), a very recent premises liability decision by the Supreme Court of New Jersey, the Court observed with respect to the issue of whether a duty of care exists: "Determining the scope of tort liability has traditionally been the responsibility of the courts. * * * The actual imposition of a duty of care and the formulation of standards defining such a duty derive from considerations of public policy and fairness. * * * 'This Court has carefully refrained from treating questions of duty in a conclusory fashion, recognizing that 'whether duty exists is ultimately a question of fairness.' " [citations omitted.]

Continuing, in *Hopkins* the New Jersey Supreme Court stated: "Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. * * * That inquiry involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. * * * The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct." (Citations omitted.) *Id.,* 625 A.2d at 1116. *See also Rustay,* 775 F.Supp. at 163.

### 4.

■ The court first addresses the liability of defendant Pers. Finch maintains that Pers had a duty to protect her from falling from the sudden gust of wind, and that Pers breached that duty by "parking" her vehicle in an uncovered area of the driveway—in fact, an area marked "No Parking."

As the accident occurred outside of Pers' apartment, indeed outside of the building, where Pers had absolutely no right of posses-sion or control over the premises, clearly, the traditional common law rules of torts applicable to landowner or possessor premises liability concerning the degree of care owed to different classes of persons on the premises (invitees, licensees, trespassers) is inapplicable to any duty owed by Pers to Finch. The threshold issue is simply whether Pers, as a waiting motorist, owed Finch, a pedestrian who at the time of the accident had exited a building en route to Pers' vehicle, a duty to protect her from falling down solely due to a sudden gust of wind; and if so, whether, as claimed by plaintiff, that duty was breached by Pers' failure to wait for Finch directly under the canopy.

After diligent research, the court was unable to discover any authority in New Jersey or any other jurisdiction which imposed on Pers, as a matter of law, a duty of care with regard to protecting Finch from falling down solely due to a sudden gust of wind.

Plaintiff attempts to gloss over the issue of whether any duty owed by Pers existed to protect Finch from sudden gusts of wind by contending that Pers was "parked" in the driveway in violation of the rules of the coop and hence was guilty of negligence *per se.*

First, plaintiff is unable to predicate any duty of care regarding protection of Finch from the wind on any rule or regulation of the coop or on any municipal or state traffic law that required Pers to line up in the driveway leading up to the canopy and wait her turn for a space under the canopy to pick up a passenger. Moreover, plaintiff failed to prove that Pers' automobile was "parked" rather than "standing" in the driveway within the purview of the coop's driveway restrictions; and in any event, the "No Parking" and "Fire Lane" restrictions" were obviously related solely to emergency vehicle access, and the restriction had no relevance whatever to protecting pedestrians from falling down from a gust of wind. *See General Accident Fire & Life Assur. Corp. v. Latiolais,* 17 So.2d 753 (Court of Appeal La.1944) (violation of ordinance prohibiting stringing of signs, etc. across any public street was held not sufficient to give rise to an action for damages where damage claimed (due to sudden gust of wind, defendant's advertising

sign was blown down and thrown against plaintiff's plate glass window) was not the kind of damage that ordinance was intended to avoid). In sum, a pedestrian fall down from a sudden gust of wind is obviously not the type of occurrence that is within the scope of the risk intended to be avoided by the "No Parking" restriction in the driveway.

■ The testimony of plaintiff's witness Newhouse *as an expert on traffic and highway safety* that the safest place in the driveway to pickup passengers was directly under the canopy, was irrelevant to an accident involving *no traffic, vehicular or highway accident,* but simply a fall down by a pedestrian on the coop's front sidewalk from a sudden gust of wind. Plainly, then, the issue of negligence *per se* raised by plaintiff concerning whether Pers was "parking" or "standing" within the purview of traffic rules, regulations, or statutes is nothing more than a "smokescreen" for the complete absence of any legitimate basis for positing that Pers had a legal duty to protect Finch from falling down solely due to a sudden gust of wind.

Also relevant to the question of the existence of a duty is whether the specific type of accident or harm to plaintiff was reasonably foreseeable from defendant's conduct or failure to act. In this case, plaintiff adduced no evidence that prior to April 3, 1992 Pers had notice that Finch, or indeed any other person, had ever been blown down from wind at the front of 2100 Linwood Avenue. Prior to the accident, Finch was (despite her advanced years) in good health, able bodied, lived alone, travelled unassisted, was capable of commuting interstate to and from her job 3½ to 4 hours a day on three buses and by walking in all kinds of weather to and from Mediterranean Towers. Over a period of many years, on the days that Pers did not transport Finch to the Bridge Plaza bus stop, Finch apparently walked from the building in all kinds of weather and wind conditions unassisted and without incident. On the evidence presented by plaintiff, a jury could not have reasonably found that Pers foresaw, or could have foreseen, that walking from the front entrance to Pers' vehicle in the driveway just beyond the canopy was an insur-

mountable effort for Finch if confronted with a sudden gust of wind.

As to the foreseeability of sudden gusts of wind, plaintiff and defendants stipulated before and during trial that the gust of wind that caused Finch to fall was "an act of G-d." As a legal term, "act of G-d" is "used to designate the cause of injury to person or property where such injury is due directly and exclusively to natural causes without human intervention and could not have been prevented by the exercise of reasonable care and foresight; an act of God, as related to cases of injurious negligence, is one against which ordinary skill and foresight are not expected to provide; and an act of God has been said to be an event so extraordinary that the history of climatic variations in the locality affords no reasonable warning or their coming." 65 C.J.S. § 21, pp. 652–53. "In order for this rule to apply, the act of God must be the sole cause of the injury. There can be no combination of an act of God and the fault of man as the presence of one excludes the other." *Sky Aviation Corp. v. Colt,* 475 P.2d 301, 304 (Supreme Ct. Wyoming 1970).

In short, under the circumstances of this case, the court determines that as a matter of law Pers had no duty to Finch to protect her from falling from a sudden gust of wind as she exited the building.

Finally, with regard to plaintiff's contention that Pers had a duty to pick her up only directly under the canopy, even if that required waiting on line for a space to become available, there is an absence of any qualified scientific or architectural evidence adduced by plaintiff from which a reasonable jury could find or infer that the area under the canopy, approximately 15 to 20 feet in height and largely open on three sides, provided any safer harbor from a gust of wind, regardless of direction or velocity, than the uncovered area of the driveway a short distance from the canopy where Pers waited for Finch to exit the building. There is not a scintilla of competent evidence that the canopy *per se* was intended or designed to afford any significant protection from wind, or in fact accomplished that purpose. Hence, the factual hypothesis of plaintiff's case for the liability

of Pers, *viz.*, that Finch would have, regardless of the direction or velocity of the wind, been protected from a gust of wind if picked up directly under the canopy, is unfounded.

5.

■ Next, the court turns to the liability of the coop whose duty of care to Finch is that imposed on owners and possessors of land to invitees or licensees, and the liability of its security contractor S.O.S. Since S.O.S. was not an owner or possessor of the premises, but simply a service provider, the security firm's duty as an independent contractor to Finch was the exercise of reasonable and prudent care under the circumstances in the performance of the responsibilities it had assumed to protect the safety and security of the building's residents and their guests on the premises. It is stressed that neither the coop nor its security staff was a guarantor or insurer of the safety of persons on the premises regardless of the cause of the accident and plaintiff asserts no claim of absolute liability.

Regardless of whether Finch was an "invitee" or "licensee" of the coop at the time and place of the accident, no duty was owed to Finch to protect her from falling due solely to a sudden gust of wind on its premises. There is no evidence that the coop actually knew, or from a diligent inspection of its property should have known or foreseen, that gusts of wind posed an unreasonable risk of injury to pedestrians exiting the building. *See Tua v. Modern Homes, Inc.*, 64 N.J.Super. 211, 165 A.2d 790 (N.J.Super.A.D.1960), *aff'd*, 33 N.J. 476, 165 A.2d 798 (1960). The possibility of a sudden gust of wind on the premises is, of course in a purely pragmatic sense, foreseeable by anyone, but such possibility does not fall into the category of a latent hazardous condition or defect in the premises that the coop had a duty to avert, correct or warn visitors. What was the coop supposed to do, post a warning sign stating: "Beware. The wind may be dangerous to your health if you exit the building," or assign security personnel to personally assist every person that has exited the building until they are off the coop's premises?

Although there is no evidence concerning the velocity of the gust of wind that knocked Finch to the pavement or the prevailing wind conditions in the area of where she fell, the parties have stipulated that the gust of wind that caused Finch to fall was an "act of G-d." As previously mentioned, there was no evidence that prior to Finch's accident of April 3, 1992 Finch or anyone else had ever fallen on any portion of the coop's front sidewalk/driveway area from a gust of wind. Therefore, relative to the probable minute risk of a person being blown down by wind in the uncovered area of the front sidewalk and driveway, the coop had no duty to burden and inconvenience its residents and visitors by restrictively accessing the pickup and discharge of passengers in automobiles solely to the area "directly under the canopy." As the coop owner of the premises had no such legal duty, neither did S.O.S. have a duty to impose such a restriction.

As noted in *Hopkins*, 625 A.2d at 1118: "However, identifying a given risk does not itself address the actual burden that would be placed on a party in preventing such a risk and whether that burden should be imposed. We note that what precautions are reasonable depends in part on the practicality of preventing harm. * * * In instances such as this, courts will be required to draw on notions of fairness, common sense, and morality in order to fix the limits of liability as a matter of public policy." (Citations omitted.).

In sum, none of the defendants are legally liable for Finch's unfortunate accident. No authority has been called to the court's attention which has imposed a duty of care on an owner or occupier of land to protect persons from injuries caused solely by a sudden gust of wind. What scant authority exists that in point, strongly controverts the existence of any such duty on the part of the defendants.

*Morril v. Morril*, 104 N.J.L. 557, 142 A. 337 (1928), appears to be the only New Jersey judicial authority addressing the issue of a landowner's liability for injury caused by a sudden gust of wind. On the critical liability issue of whether there was a duty owed to plaintiff, a 13 year old boy who was visiting at the house of his aunt, the defendant, the court's decision turns largely on the element

of the foreseeability of the injury to plaintiff by defendant.

At defendant's direction plaintiff went out into the yard to play with other boys. While playing, plaintiff fell against a protruding defective latch on a garage door blown open by a gust of wind (or possibly opened by the boys playing in the yard) causing plaintiff to lose his eye. It further appears that prior to the accident defendant was aware of the defective latch, tried to repair it but made it worse, and the latch could not hold the garage door closed. The Court of Errors and Appeals of New Jersey (then New Jersey's highest appellate court), reciting the settled maxim of the common law that from physical injury, legal injury and liability do not necessarily result or follow, focused on the principle that the existence of a legal wrong or liability which presents the basis of a suit must be predicated on the violation, neglect or omission of some legal duty which was imposed on the defendant, and which constituted the proximate cause of the damage. Although the defendant landowner in *Morril* had knowingly left a defective latch on the garage door which could open, and had a legal duty to exercise foresight to anticipate all the varied possibilities of harm or injury, *the New Jersey court held emphatically that no legal duty was imposed on the defendant landowner to anticipate or foresee that a gust of wind could force the door open thus making it possible for the defective latch to cause injury to the plaintiff and take steps to prevent that possibility.*

The *Morril* court went on to hold, on the issue of whether the defendant's failure to replace the defective door latch was the proximate cause of plaintiff's injury, that the unexpected gust of wind that opened the door was an *intervening cause* that broke the causal chain of injury by the defective door latch and negated defendant's liability for maintaining the defective door latch on the premises.

Defendants call the court's attention to *Frances K. Resag v. Washington Nat. Ins. Co.*, 90 Ill.App.3d 971, 46 Ill.Dec. 385, 414 N.E.2d 107 (1980). There, an invitee pedestrian brought an action for personal injuries against the owner and operator of an office building and the defendant bank, a tenant, for injuries sustained by the plaintiff when she exited the bank onto a plaza and was blown by high velocity wind currents approximately ten feet into the air. It was necessary to walk on the plaza to enter and leave the bank and plaintiff transacted business at the bank as an invitee. Allegedly, the accident was caused by the defective design and configuration of the building which altered the natural condition of the wind currents on the plaza. Plaintiff claimed that defendants were negligent in allowing the plaza to remain open despite their knowledge of the high velocity winds that resulted from the design of the building, and in failing to place devices on the plaza which could be held by pedestrians to prevent them from being blown away by the wind. The Illinois Appellate Court affirmed the lower court's dismissal of the complaint for failure to state a cause of action.

The Appellate Court, observing the fundamental common law rule that "[n]ecessary to recovery [for common law negligence] is the existence of a duty or an obligation requiring one to conform to a certain standard of conduct for the protection of another against an unreasonable risk." *Id.*, 46 Ill.Dec. at 387, 414 N.E.2d at 109, held that the dispositive issue was whether defendant had a duty to protect pedestrians exiting the building from the wind, and if so, whether or not that duty was breached by defendants. The court noted that the issue of whether or not there was a duty, which turns on many factors, such as foreseeability of the occurrence, public policy and social requirements, is a question of law to be determined by the court, "because liability for common law negligence is not absolute but rather it is based on fault." *Id.* The Illinois Court held that defendants neither could nor should have reasonably foreseen that an invitee pedestrian would be injured by the winds in the plaza caused by the design of the building; and that even if harm to the invitee was foreseeable, defendant *had no legal duty to guard against such injury* in light of the costs to minimize the effect of the building on prevailing winds, and, the remote possibility that an invitee would be blown to the ground by the wind.

In the present case, there is no scientific evidence whatever of either a negative or positive impact of the building's or canopy's architectural design or configuration on prevailing wind currents. As aptly stated in *Washington National Insurance Co.*: "No man can be expected to guard against harm from events which are not reasonably to be anticipated at all, or are so unlikely to occur that the risk, although recognizable, would commonly be disregarded. In judging whether harm was legally foreseeable we consider what was apparent to the defendant at the time of his now complained of conduct, not what may appear through the exercise of hindsight." *Id.*, quoting from Prosser (Handbook of the Law of Torts (4th ed. 1971, sec. 31, at 146).

Significantly too, after holding that the *Washington National* defendants could not have reasonably foreseen, at the time of their allegedly negligent conduct, that an invitee pedestrian would be lifted up and blown away by high velocity winds in the plaza caused by the design and configuration of the building, and hence no duty to plaintiff arose, the Illinois Appellate Court observed:

> *However, even if the harm was foreseeable, other factors would compel us to find there was no legal duty.* The likelihood that a person would be lifted, blown to the ground and injured by the wind is minimal. The burden sought to be imposed on defendants is a heavy one because a building, or any other object of significant size which extends above the ground level, may well alter natural wind currents. The economic cost to defendants to try to minimize the effect of the building on prevailing winds would be enormous. To impose a duty on an owner or occupier of land to construct, maintain and operate a building so that wind flow is altered to a lesser degree or to impose a duty on him to close the entrances to his establishment or to provide numerous handrails on his premises to protect all invitee pedestrians would be manifestly unfair. This is particularly true in view of the remote possibility of the occurrence such actions might or might not prevent.

46 Ill.Dec. at 387, 414 N.E.2d at 109 (emphasis added).

**6.**

Fully recognizing that defendants' liability for Finch's accident cannot as a matter of law be predicated merely on a sudden gust of wind—stipulated by the parties to be an act of G-d—the plaintiff urges the well-settled negligence doctrine of concurring or contributing causation, citing *Cora v. Trowbridge Outdoor Adv. Corp.*, 18 N.J.Super. 1, 4, 86 A.2d 590 (App.Div.1952) ("where defendant has been guilty of negligence which is an efficient and cooperating cause of the mishap, the defendant is not exonerated from liability by proof that an act of G-d was a concurring cause"). This court is, of course, aware that "[t]he law books are full of cases where human negligence and some force of nature have concurred to produce an accident and injury, and where the contributing factor of the natural force, such as lightning, wind, or the like, has been held to be no excuse for the concurrent human negligence." *Fairbrother v. Wiley's, Inc.*, 183 Kan. 579, 331 P.2d 330 (Supreme Ct. Kansas 1958) (in action for personal injuries, store owner held negligent in failing to construct, inspect and maintain its plate glass display windows to withstand strong winds which frequently occurred and could not be relieved of liability to a person on the sidewalk *injured by broken glass when a window blew out* during a gust of wind; under the circumstances, gusty wind was not an intervening cause or "act of G-d"). *See also Swanson v. La Fontaine*, 238 Minn. 460, 57 N.W.2d 262 (1953) (action by pedestrian walking on sidewalk for personal injuries where hood was blown off parked automobile by high wind and carried through the air and *the hood injured plaintiff*). However, since in this case the sudden gust of wind was the sole cause of plaintiff's fall and injury, and as a matter of law no duty was owed by any of the defendants to plaintiff to protect her from a sudden gust of wind, the court sees no applicability of a concurring or contributing cause analysis.

Finally, plaintiff's additional contention, citing *Hunziker v. Scheidemantle*, 543 F.2d 489 (3d Cir.1976), that defendants' negligence must be inferred on the basis of *res ipsa*

*loquitur* completely misses the mark on the facts of this case and does not merit discussion.

### *CONCLUSION*

On the basis of the evidence presented, all defendants are entitled to judgment as a matter of law, and therefore the complaint is dismissed. All cross-claims of defendants for indemnity and/or contribution, etc. are dismissed as moot. The Clerk is directed to enter judgment of dismissal accordingly.